**Lieutenant Colonel Jane ABLE, Petty Officer Robert Heigl, First Lieutenant Kenneth Osborn, Sergeant Steven Spencer, Lieutenant Richard von Wohld, and Seaman Werner Zehr, Plaintiffs,**

v.

**UNITED STATES of America, and William J. Perry, Secretary of Defense, in his official capacity, Defendants.**

**No. CV 94–0974.**

United States District Court,
E.D. New York.

April 4, 1994.

exercise supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3).

Sullivan & Cromwell (David H. Braff, Michael Lacovara, Penny Shane, Julie B. Crockett, Eulalia Mack, of counsel), American Civil Liberties Union Foundation (Ruth E. Harlow, William B. Rubenstein, Marc E. Elovitz, of counsel), Lambda Legal Defense & Educ. Fund (Evan Wolfson, Beatrice Dohrn, of counsel), New York City, for plaintiffs.

Department of Justice (Richard G. Lepley, Vincent M. Garvey, of counsel), Washington, DC, Department of the Army (Captain Tara O. Hawk, Office of the Judge Advocate Gen., of counsel), Zachary W. Carter, U.S. Atty., (Charles S. Kleinberg, of counsel) Brooklyn, NY, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

■ Six plaintiffs, alleging they are lesbian and gay members of the United States Armed Services (the Services), brought this action against the United States and William J. Perry, Secretary of Defense, for (a) a declaration that Section 571 of the National Defense Authorization Act for the Fiscal Year 1994 (the Act), 10 U.S.C. § 654, concerning a new policy as to homosexuals, and Regulations issued under the Act, are invalid under the First and Fifth Amendments, and (b) an order enjoining the defendants from enforcing the Act and the Regulations.

This action appears to be the first to challenge the new policy, which became effective February 28, 1994.

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. Venue lies in this district under 28 U.S.C. § 1391.

Moving pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiffs ask the court to enjoin defendants pending resolution of the case from investigating, discharging, or taking other adverse action against plaintiffs because they have identified themselves as gay or lesbian.

### THE COMPLAINT

The complaint states, in substance, the following.

Each plaintiff is a lesbian or gay member of the Services who has served honorably for years. The Act and the Regulations violate plaintiffs' equal protection and free speech rights and impose on lesbians and gays punitive rules unrelated to fitness and ability to serve, rules promoting no legitimate military interest and based on presumed prejudices of heterosexual service members and civilians.

### THE ACT AND THE REGULATIONS

The Act, 10 U.S.C. § 654, entitled Policy Concerning Homosexuality in the Armed Forces, contains in subsection (a) "findings" that, among other things, the prohibition against homosexual "conduct" is a longstanding and still necessary element of military law, and that the presence in the Services of

persons who demonstrate a propensity or intent to engage in homosexual "acts" would create an unacceptable risk to the standards of "good order" and "unit cohesion" essential to military capability.

Subsection (b), setting forth the Act's policy, recites, in substance, that a member of the Services "shall be separated" from them if one or more of the following three findings is made:

(1) The member is found to have engaged, attempted to engage, or solicited another to engage, in homosexual acts, unless the member has demonstrated, among other things, that he or she "does not have a propensity or intent to engage in homosexual acts."

(2) The member "has stated that he or she is a homosexual or bisexual or words to that effect," unless "the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts."

(3) The member has married or attempted to marry someone of the same sex.

Subsection (f) contains definitions. "Homosexual" includes "the terms 'gay' and 'lesbian'" and means a person who engages, attempts to engage, has a "propensity" to engage, or "intends" to engage, in homosexual acts. The term "homosexual act" means any bodily contact between members of the same sex to satisfy sexual desires or any such contact that a reasonable person would understand to "demonstrate a propensity" or "intent" to engage in such an act.

The Act has no definition of the word "propensity."

On December 21, 1993 the Secretary of Defense issued a memorandum concerning the implementation of the new policy stating that no one applying to become a member "will be asked about his or her sexual orientation," that "homosexual conduct may be a basis for rejection," and that the suitability of persons to serve will be based not on "sexual orientation" but on "homosexual acts" and "statements that reflect on intent or propensity to engage" in such acts.

The Directives, 1332.14 and 1332.30, issued with the memorandum confirm that while "homosexual orientation is not a bar" to continued service, "homosexual conduct" is. Such conduct includes not merely homosexual "acts" but also "a statement by a member that demonstrates a propensity or intent to engage" in such acts. A member who "has made a statement" that he or she is a homosexual shall be separated unless the member demonstrates that he or she does not engage, or intend to engage, or have a "propensity" to engage in homosexual acts.

Thus, as the Guidelines annexed to the Directive put it, a statement by a service member that he or she is a homosexual "creates a rebuttable presumption" that the member "engages in homosexual acts or has a propensity or intent to do so."

While the word "propensity" is distinguished in the Act from "intent," it is not defined. The word is generally understood and defined to mean a "natural inclination" or an "innate or inherent tendency." Webster's Third New International Dictionary 1817 (1986); *see also* Random House Dictionary of the English Language 1152 (1966). "Innate" means "existing in one from birth" or "inborn." Random House at 733; *see also* Webster's at 1165.

Neither the Act nor the Directives suggest how one who is born with an innate tendency, a "propensity," to commit a homosexual act can prove that he or she does not have such a propensity. To invite someone to prove that he or she does not have an inborn tendency seems like a hollow offer.

The Directives state that "propensity" to engage homosexual conduct "means more than an abstract preference or desire to engage" in homosexual acts and "indicates a likelihood that a person engages in or will engage in" them. But the Guidelines make clear that the very statement of homosexual orientation establishes such a likelihood. The Guidelines treat as "homosexual conduct" not merely statements that in context may reasonably be considered as revelations of intent to or as invitations to engage in homosexual acts. The Guidelines go so far as to make any statement of homosexual orientation, wherever and whenever made in

the past and to whatever person, even a statement to this court, as proof of an intent to engage in homosexual acts.

Thus, "statements such as 'I am a homosexual,' 'I am gay,' 'I am a lesbian,' 'I have a homosexual orientation,' and the like" constitute "homosexual conduct." This is hardly consistent with the avowed policy of the Act that not "homosexual orientation" but only homosexual "conduct" is a "bar" to service.

To treat a statement as to homosexual orientation made to a court to test the law as itself "homosexual conduct" is to call into question the Act's assurance that it deals only with homosexual acts. The fact that the officials implementing the policy are directed not to ask service members "to reveal their sexual orientation" shows that the Act is really concerned not so much with "conduct" but with the attitudes of others when they learn of statements of homosexual orientation. The message to those with such an orientation appears to be not to avoid private homosexual acts but to stay in the closet and to hide their orientation.

### THE CONSTITUTIONAL CLAIMS

Plaintiffs raise on the present motion claims that the Act and the Regulations violate their equal protection rights under the Fifth Amendment to the United States Constitution and their right to free speech under the First Amendment.

### Free Speech

Plaintiffs say that the Act inhibits their right to free speech because they face retaliation for statements they must make in this action to test the Act's constitutionality.

The fact that the complaint identifies plaintiffs as having a homosexual orientation has caused the Services to take action against some of them. For example, on March 10, 1994 the commanding officer of plaintiff Robert S. Heigl sent a notice to him entitled "Notification of Administrative Discharge by Reason of Unsuitability Due to Homosexuality." The notice says that the officer is recommending that Heigl be discharged on the basis of his declaration in this case that he is a homosexual. The notice makes no mention of homosexual "acts."

The First Amendment guarantees the right "to petition the Government for a redress of grievances," and that includes the right of access to the courts. *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741, 103 S.Ct. 2161, 2169, 76 L.Ed.2d 277 (1983). Indeed, "[t]he Supreme Court has described the right to petition government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir.1988) (*quoting United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)).

The statement "I am a homosexual" or "I am gay" or "I am a lesbian" contains both "speech" and "nonspeech" elements. The verbalization is clearly speech. As the Supreme Court has held, a person's "inclinations" are "his own and beyond the reach of government." *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992) (*quoting Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 67, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973)); *see also R.A.V. v. City of St. Paul,* 505 U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) ("[c]ontent-based regulations are presumptively invalid" and "hate speech" statute facially invalid under the First Amendment) (*citing Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 505 U.S. ——, ——, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991)).

But the statement is also an act of identification, a "nonspeech" element. The Supreme Court has held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). That case set forth the criteria for determining whether a limitation is sufficiently justified.

[A] government regulation is sufficiently justified if it is within the constitutional

power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.,* 391 U.S. at 377, 88 S.Ct. at 1679.

To say that plaintiffs may not even petition this court and litigate this case without incurring the disabilities that defendants seek to visit upon them seems to this court at least to raise a serious First Amendment question.

This court is aware that a review of military regulations challenged on First Amendment grounds is "far more deferential" than a review of similar regulations designed for civilian society. *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). That case, while recognizing that certain "aspects of military life do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment," *id.,* 475 U.S. at 507, 106 S.Ct. at 1313, upheld against a First Amendment challenge an Air Force regulation preventing the plaintiff from wearing a yarmulke while on duty and in uniform. *See also Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (upholding Air Force regulation requiring Air Force members to obtain command approval before circulating petitions on base); *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding Army regulation that prohibited political speeches and demonstrations on base).

But here plaintiffs face wider and more constant restraints. The Act and Regulations restrict their speech not only while they are in uniform and on duty, or on base, but in every conceivable aspect of their lives, including the prosecution of this lawsuit.

The Supreme Court in *Brown v. Glines, supra,* said that a military regulation may "restrict speech no more than is reasonably necessary to protect the substantial governmental interest." 444 U.S. at 355, 100 S.Ct. at 600. This court holds that there is a serious question as to whether a regulation goes beyond what is reasonably necessary to protect any possible government interest when it inhibits six service members from continuing to speak in court to make a constitutional challenge.

### *Equal Protection*

Plaintiffs assert that the Act and Regulations violate their right to equal protection, serve no rational, legitimate government interest, and reflect only the actual or perceived private prejudices of those who are not lesbian or gay.

The court analyzes Fifth Amendment equal protection challenges by the same standards as those applicable to claims of violation of the equal protection clause of the Fourteenth Amendment. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).

The court assumes for the purposes of the motion that the Act and Regulations are subject to only minimal equal protection scrutiny. Under that standard they are valid if the distinction they make is "rationally related to a legitimate governmental purpose," *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985), and plaintiffs must negate "every conceivable basis which might support" the challenged rules. *Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993).

There is a split of authority as to whether the military's prior policy, making the status of being a homosexual "incompatible with military service," denied homosexuals equal protection because no similar policy obtained as to heterosexuals.

Some courts have flatly held that the distinction has no rational basis. *See, e.g., Dahl v. Secretary of the United States Navy,* 830 F.Supp. 1319 (E.D.Cal.1993) (finding no rational basis for homosexual ban and granting plaintiff summary judgment); *Meinhold v. United States Dep't of Defense,* 808 F.Supp. 1455 (C.D.Cal.1993) (same), *stay denied,* CV–92–6044, 1993 WL 195368 (9th Cir. Mar. 5, 1993) (per curiam), *stay granted in part, stay denied in part,* —— U.S. ——, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993) (staying injunction, pending appeal, except as applicable to

named plaintiff); *Steffan v. Aspin*, 8 F.3d 57 (D.C.Cir.1993) (finding ban unconstitutional), *vacated for rehearing in banc*, Jan. 7, 1994.

Others have found that a ban on homosexuals at least raises a serious equal protection question. *See, e.g., Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir.1992) (raising equal protection question *sua sponte* and remanding to district court), *cert. denied*, — U.S. —, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992); *Elzie v. Aspin*, 841 F.Supp. 439 (D.D.C.1993) (finding, on motion for preliminary injunction, that plaintiff "presents a strong case that he will probably succeed" on equal protection claim).

Other cases have held the ban rational. *See, e.g., Woodward v. United States*, 871 F.2d 1068, 1076–77 (Fed.Cir.1989) (raising *sua sponte* equal protection claim and finding ban on homosexual conduct constitutional), *reh'g denied*, (Fed.Cir.1989), *cert. denied*, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); *Rich v. Secretary of Army*, 735 F.2d 1220, 1229 (10th Cir.1984) (finding ban constitutional).

This court does not now undertake to assess the relative merits of these divergent holdings. It is enough to say that the allegedly new policy makes the same distinction between homosexuals and heterosexuals as did the prior policy. The conflict of authority signifies the seriousness of the questions going to the merits of plaintiffs' equal protection claim.

### STANDARDS FOR ENTRY OF A PRELIMINARY INJUNCTION

The standards for issuing a preliminary injunction in this circuit are clear. A party seeking a preliminary injunction must show

"(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief."

*Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1338 (2d Cir.1992), *vacated as moot*, — U.S. —, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991)); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

■ The plaintiffs have satisfied the first element, irreparable harm, as to their claims under both the Fifth Amendment and the First Amendment. A showing of a possible violation of constitutional rights constitutes irreparable harm justifying a preliminary injunction. *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984).

There is no merit to the government's assertion, citing *Sampson v. Murray*, 415 U.S. 61, 90–92, 94 S.Ct. 937, 952–53, 39 L.Ed.2d 166 (1974), that this court can never preliminarily enjoin a discharge from federal employment. In that case the Court held that a probationary government employee about to be discharged, allegedly in violation of United States Civil Service Regulations, could not have a preliminary injunction. No constitutional issue was at stake, and the employee could be made whole with money damages. Money damages cannot recompense the six plaintiffs here for violations of their rights to free speech and equal protection.

■ The government also says plaintiffs must exhaust their administrative remedies in the Services before coming to court. Exhaustion is not required when, as here, plaintiffs raise constitutional questions and irreparable injury will occur without preliminary judicial relief. *See Guitard v. United States Secretary of Navy*, 967 F.2d 737, 741 (2d Cir.1992).

Plaintiffs make a substantial claim that to subject them to the Act and Regulations will deny them equal protection every day. The court holds that this constitutes irreparable harm.

With respect to the free speech claim, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *see also Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991). Mr. Justice Brennan's opinion in the

*Burns* case said that public employees threatened with discharge from their positions because they were exercising their First Amendment rights of association in a political party had shown irreparable injury.

Defendants say that whatever chill there may have been of plaintiffs' right to speak must have come from the threat of permanent discharge, that this threat did not serve to prevent plaintiffs from speaking through their complaint, and that a preliminary injunction would not now retroactively thaw the supposed chill. Defendants cite *American Postal Workers Union v. United States Postal Service,* 766 F.2d 715, 722 (2d Cir. 1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986), and *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988).

Defendants' contention embodies an erroneous premise. Plaintiffs' free speech claim is not based merely on their statements in the complaint. They are faced with a continuing inhibition on speech throughout of the litigation. The Act and Regulations provide that a statement of homosexual orientation creates a "rebuttable" presumption that the speaker engages in or intends to engage in homosexual acts, or has a propensity to do so. For reasons stated above, that presumption is virtually irrebuttable. But at least in theory there is a slim chance that a plaintiff might be able to rebut it.

Section H(b)(2) of the Standards and Procedures accompanying the Directives provides that the nature and circumstances of a statement that a member is a homosexual may be considered by the officer determining whether the member has rebutted the presumption of intent to or propensity to engage in homosexual acts. Yet for plaintiffs to litigate the issue they must make repeated assertions of their homosexuality in affidavits and in testimony. Unlike *Savage* and *American Postal Workers Union,* where the plaintiffs had concluded the exercise of their First Amendment rights before the litigation had commenced, plaintiffs here must, to pursue their case, continue speaking about their homosexuality.

Under the Act and Regulations for a plaintiff to persist in this lawsuit, filing affidavits and presenting testimony, is to make it less likely that he or she will have any chance of rebutting the presumption. The reiteration of homosexual orientation may be used by the Services to find a strengthening of any inference of an intent to commit homosexual acts. In short, the more vigorous plaintiffs' prosecution of their claims, the greater is their risk of the ultimate punishment of discharge. Their First Amendment right to seek redress in the court and to speak freely is under a constant and ever-increasing chill.

Just as in *Elrod v. Burns, supra,* where the plaintiffs had a continuing First Amendment right to associate during the course of the litigation, here plaintiffs have a continuing right to exercise their right to speak in order to persevere in the case. By preliminarily enjoining defendants the court can thereby protect this right.

For reasons already discussed, the court holds that plaintiffs have established serious questions going to the merits. The court holds that this showing is adequate to satisfy a part of the second half of the criteria for issuance of a preliminary injunction.

In the *Haitian Centers* case, *supra,* the Court of Appeals for the Second Circuit approved a preliminary injunction against the United States Immigration Service and various United States government officials, enjoining them from repatriating certain Haitians. The court held that plaintiffs, who would be irreparably damaged without the injunction, needed to show only sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward them. The court rejected the United States government officials' contention that because they were asserting a "public interest" they could not be enjoined from taking action in fulfillment of their statutory duties unless the movant showed nothing less than a likelihood of success on the merits.

As the Second Circuit held, the government may not assume that the public interest lies solely with it. *Haitian Centers,* 969 F.2d at 1339. "[T]he public interest also requires obedience to the Constitution." *Carey v. Klutznick,* 637 F.2d 834, 839 (2d Cir.1980). As in the *Haitian Centers* case so here, "no party has an exclusive claim on the public

interest," and the "likelihood of success" standard "need not always be followed merely because a movant seeks to enjoin government action." 969 F.2d at 1339.

In the present case the military asserts a public interest in the maintenance of "good order" and "unit cohesion." The plaintiffs invoke the public interest in protecting rights granted by the First and Fifth Amendments. The preservation of rights of free speech and equal protection seems to this court quite as much in the public interest as a claim that the pursuit of this lawsuit by six plaintiffs constitutes a serious threat to the military integrity of the armed forces.

On the authority of the *Haitian Centers* case this court holds that plaintiffs may have a preliminary injunction if they show irreparable damage and sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in their favor.

Those decisions said by the government to require plaintiffs to show a likelihood of success are, as the *Haitian Centers* opinion said, distinguishable. Plainly not in point are cases where the movant relies not on the Constitution but on statutory language to obtain a preliminary injunction. *See, e.g., Medical Soc'y of the State of New York v. Toia,* 560 F.2d 535 (2d Cir.1977). In *Sweeney v. Bane,* 996 F.2d 1384 (2d Cir.1993), and *Union Carbide Agric. Prods. Co. v. Costle,* 632 F.2d 1014 (2d Cir.1980), the court found no substantial constitutional claim at issue. In *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577 (2d Cir.1989), a plaintiff dumping hazardous medical wastes into the Hudson River sought preliminarily to enjoin its suspension by New York State as a Medicaid provider. The court held that plaintiff had no *ex post facto* claim and a speculative at best due process claim. The public interest lay heavily on the side of the state.

In addition to the other preconditions to a preliminary injunction plaintiffs must, as already noted, show a balance of hardships tipping decidedly in their favor. *Haitian Centers,* 969 F.2d at 1338.

Only the six plaintiffs can obtain preliminary relief in this case. Were this a class action affecting all homosexuals in the Ser-

vices the balance of hardship analysis might be different.

If plaintiffs obtain a preliminary injunction the current regulations will remain in force against all other service members. The potentially adverse effect on "good order" and "unit cohesion" of allowing these six plaintiffs to remain on duty and not subject to investigation while the case is pending can be minimal at most.

In any event there seems to be little reason to believe that the presence in the Services of these six members during the litigation will cause any acute actual disruption. The court does not prejudge the merits. But the evidence presented in other courts casts doubt on the extent of any harm to be anticipated from the presence of homosexuals in the military. *See, e.g., Meinhold,* 808 F.Supp. at 1457–58 (granting permanent injunction against discharging homosexuals absent conduct interfering with the military mission); *see also* National Defense Research Institute, "Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment" (RAND, 1993) (report prepared at the direction of the Secretary of Defense).

The hardship to the six plaintiffs is evident and immediate. As explained above, their free speech rights to pursue this case will be chilled. They will be subjected to adverse action, including likely discharge from their chosen profession, on the basis of what substantial judicial authority has deemed unconstitutional discrimination. To deprive someone of constitutional rights is to inflict a hardship, and an especially heavy one where the rights are to free speech and equal protection.

The court finds that the balance of hardships tips decidedly in favor of the six plaintiffs.

*CONCLUSION*

Plaintiffs' motion is granted preliminarily enjoining the defendants pending resolution of the case from investigating or discharging or taking other adverse or punitive action against plaintiffs based on their self-identification as gay or lesbian in connection with

legal proceedings challenging the constitutionality of the Act and the Regulations.

So ordered.