Lieutenant Colonel Jane ABLE, Petty Officer Robert Heigl, First Lieutenant Kenneth Osborn, Sergeant Steven Spencer, Lieutenant Richard von Wohld, and Seaman Werner Zehr, Plaintiffs,

v.

UNITED STATES of America, William J. Perry, Secretary of Defense, in his official capacity, and Federico F. Peña, Secretary of Transportation, in his official capacity, Defendants.

No. 94 CV 974.

United States District Court,
E.D. New York.

March 30, 1995.

**970**

Sullivan & Cromwell (David H. Braff, Michael Lacovara, Penny Shane, Ellen Bresler, Edward A. Harris, Ann T. Kenny, of counsel), American Civil Liberties Union Foundation (Ruth E. Harlow, Marc E. Elovitz, Matthew Coles, of counsel), Lambda Legal Defense & Educ. Fund (Beatrice Dohrn, Evan Wolfson, of counsel), New York City, for plaintiffs.

Department of Justice (Frank W. Hunger, Zachary W. Carter, John A. Rogovin, Charles S. Kleinberg, David J. Anderson, Vincent M. Garvey, Margaret H. Plank, Robert A. Van Kirk, Kevin W. Simpson, Mark T. Quinlivan, of counsel), Department of Army (Major Douglas K. Mickle, Captain Tara O. Hawk, Washington, DC, Office of Judge Advocate General, of counsel), for defendants.

### MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiffs, six members of the United States Armed Services (the Services) who have stated that they are homosexual, brought this action for an order (1) declaring invalid under the First and Fifth Amendments Section 571 of the National Defense Authorization Act for the Fiscal Year 1994, 10 U.S.C. § 654 (the Act), concerning a new policy as to homosexuals, and the directives issued under the Act (the Directives), and (2) enjoining the government from enforcing the Act and the Directives.

This court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. Venue lies here under 28 U.S.C. § 1391.

On April 4 and May 9, 1994, this court on plaintiffs' motions preliminarily enjoined defendants from enforcing the Act and the Directives against plaintiffs based on their statements of sexual orientation. *Able v. U.S.*, 847 F.Supp. 1038 (E.D.N.Y.1994); *Able v. U.S.*, No. 94 CV 0974 (E.D.N.Y. May 9, 1994).

On September 14, 1994, this court granted defendants' motion to dismiss the complaint as to plaintiffs' intimate association, vagueness and overbreadth claims, but denied defendants' motion to dismiss the first amendment and equal protection claims. *Able v. U.S.*, 863 F.Supp. 112 (E.D.N.Y.1994).

While the motion to dismiss was pending, defendants appealed the court's preliminary injunction orders pursuant to 28 U.S.C. § 1292(a)(1). On January 3, 1995, the Court of Appeals for the Second Circuit remanded the case, holding that this court had not applied the proper preliminary injunction standard and ordering consolidation of a preliminary injunction hearing with a trial on the merits of the permanent injunction. The Court of Appeals directed that "[t]he preliminary injunction orders shall remain in effect until March 31, 1995 upon which date they shall expire unless reentered by the district court following a trial on the merits...." *Able v. U.S.*, 44 F.3d 128, 133 (2d Cir.1995) (per curiam).

On March 6, 1995, this court held that under the pleadings plaintiffs lacked standing to claim that (1) the Act violates their right to expressive association, (2) subsection 654(b)(1) violates their rights to free expression and equal protection, and (3) subsection 654(b)(3) violates their right to equal protection. *Able v. U.S.*, No. 94 CV 0974, 1995 WL 116322 (E.D.N.Y. Mar. 6, 1995).

From March 13 to March 16, 1995 the court tried the merits of plaintiffs' remaining claims.

## THE GENESIS OF THE ACT

On January 29, 1993 President Clinton directed then Secretary of Defense Les Aspin to submit a draft executive order "ending discrimination on the basis of sexual orientation in determining who may serve" in the Services, in a manner "consistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain." Memorandum from President Clinton to the Secretary of Defense (Jan. 29, 1993), Ex. PX–21.

On July 19, 1993, Secretary Aspin announced a new policy as to the service of gay men and lesbians in the Services, stating that "sexual orientation is considered a personal and private matter . . . and is not a bar to service entry or continued service unless manifested by homosexual conduct." Memorandum from Secretary Aspin to the Secretaries of the Army, Navy and Air Force and the Chairman of the Joint Chiefs of Staff (Jul. 19, 1993), Ex. PX–180.

From March through late July 1993 the Armed Services Committees of the House and Senate held public hearings on the matter. Secretary Aspin presented the administration's new policy to the Senate Armed Services Committee on July 20, 1993.

Both Committees issued reports recommending legislation practically identical to what is now the Act, which became effective November 30, 1993. The Directives became effective February 28, 1994. On March 15, 1994, the United States Coast Guard announced its policy on homosexual conduct "in lock step" with that of the other military services. Memorandum from Secretary Of Transportation Federico Peña to the Commandant, United States Coast Guard (Mar. 15, 1993), Ex. JX–13 at p. B301327.

## THE ACT AND THE DIRECTIVES

Section 654, entitled Policy Concerning Homosexuality in the Armed Forces, contains in subsection (a) "fifteen findings" that say, among other things:

(6) Success in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion.

(13) The prohibition against homosexual conduct is a long-standing element of military law that continues to be necessary in the unique circumstances of military service.

(14) The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

(15) The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

Subsection (b), setting forth the Act's policy, states, in substance, that a member "shall be separated" from the Services if one or more of the following three findings is made:

(1) The member is found to have engaged, attempted to engage, or solicited another to engage, in homosexual acts, unless the member has demonstrated, among other things, that "such conduct" departs from the member's usual behavior and he or she "does not have a propensity or intent to engage in homosexual acts."

(2) The member "has stated that he or she is a homosexual or bisexual or words to that effect," unless "there is a further finding" made in accordance with regulations that "the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts."

(3) The member has married or attempted to marry someone of the same sex.

Subsection (f) contains definitions. "Homosexual" includes "the terms 'gay' and 'lesbian'" and means a person who engages, attempts to engage, has a "propensity" to engage, or "intends" to engage, in homosexual acts. The term "homosexual act" means any bodily contact between members of the same sex to satisfy sexual desires or any such contact that a reasonable person would understand to "demonstrate a propensity" or

"intent" to engage in such an act. The Act does not define the word "propensity."

On December 21, 1993 Secretary Aspin issued a memorandum and Directives concerning the implementation of the new policy. Memorandum from Secretary Aspin to the Secretaries of the Military Departments *et al.* (Dec. 21, 1993), Ex. JX–4. They provided that an applicant to become a member will not be asked about his or her sexual orientation, that "homosexual orientation is not a bar" to "service entry or continued service," but that "homosexual conduct" is. Such "conduct" includes not only homosexual "acts" but also a statement by a member or applicant that "demonstrates a propensity or intent to engage" in such acts. A statement that demonstrates the "propensity" will thus require separation unless the member rebuts a presumption that he or she engages or intends to engage in "homosexual acts" or has a "propensity" to do so. Directives 1332.14, 1332.30, & 1304.26, Exs. JX–6, JX–7, & JX–9.

As examples of statements giving rise to the presumption the Directives include "I am a homosexual," "I am gay," "I am a lesbian," and "I have a homosexual orientation." *Id.* The Directives purport to distinguish homosexual "orientation" from homosexual "propensity," defining homosexual "orientation" as "an abstract sexual preference for persons of a particular sex," and homosexual "propensity" as evidencing "a likelihood that a person engages in or will engage in." homosexual acts. *Id.*

The Directives go on to say that "a statement ... demonstrat[ing] a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts." *Id.*

The Directives do not explain how an "orientation" means an "abstract preference" if not revealed but if admitted becomes evidence of a "likelihood" to commit acts, a likelihood that requires discharge.

### THE ISSUE BEFORE THE COURT

The six plaintiffs have "stated" in their complaint that they are "homosexuals." That is the only thing that they have done that is now before the court. Under the state of the pleadings the court thus does not consider the case to draw into question the validity of any subsection of the Act other than (b)(2).

Subsection (b)(2) has two aspects pertinent to this case. It provides for the discharge of a member because he or she (1) has made a "statement" and (2) the statement is of his or her status, that is, his or her "propensity."

Plaintiffs urge that subsection (b)(2) is invalid both under the First Amendment and the equal protection component of the due process clause of the Fifth Amendment.

### THE LEGISLATIVE PURPOSE

Before addressing the constitutional validity of subsection (b)(2) the court looks to the text of the entire Act to determine the end to which the Act is directed.

The Act says that its objective is to reach "homosexual conduct," that is, "homosexual acts" as they are defined in the Act. Thus finding (13) in subsection (a) says that the "prohibition against homosexual conduct" in the military is "necessary." Finding (15) indicates that the prohibition against such conduct is so necessary that even those who have a mere "propensity" to engage in that conduct must be discharged from the military because their status as homosexuals makes it likely that they will commit homosexual acts.

The statement "I am a homosexual" or "I have a homosexual propensity" is thus prohibited by the terms of the Act not because the statement itself causes harm but because one can infer from it that the speaker will do harmful things, namely, commit "homosexual acts" injurious to "morale, good order and discipline, and unit cohesion."

### THE FIRST AMENDMENT

The free speech clause of the First Amendment reads: "Congress shall make no law ... abridging the freedom of speech."

The first question for the court is whether the government may under the First Amendment prohibit a member of the Services from stating that he or she is a homosexual, that is, that he or she has an innate feeling within that indicates the status of a homosexual.

Plaintiffs' statements that they are homosexual constitute "speech," and important, not trivial, speech. The First Amendment recognizes the value of speech not only as an instrument, that is, a mechanism by which ideas may be exchanged, but also as an expression of personal dignity and integrity. Speech is worthy of First Amendment protection not only when it contributes to the "marketplace of ideas" or assists in the search for "truth," but also when it articulates "the premise of individual dignity and choice upon which our political system rests." *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971). "Those who won our independence believed that the final end of the State was to make men free to develop their faculties.... They valued liberty both as an end and as a means." *Whitney v. California,* 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., joined by Holmes, J., concurring).

Plaintiffs have done no more than acknowledge who they are, that is, their status. The speech at issue in this case implicates the First Amendment value of promoting individual dignity and integrity, and thus is protected by the First Amendment from efforts to prohibit it because of its content.

Regulation of the content of speech that involves First Amendment concerns is presumed invalid. *See R.A.V. v. City of St. Paul,* — U.S. —, —, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992); *Simon & Schuster, Inc. v. New York Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991). The government may regulate its content only upon a showing that such regulation promotes a "compelling interest" and that the government has chosen "the least restrictive means" to further the interest. *Sable Communications of California, Inc. v. F.C.C.,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989).

The court recognizes that the judgments of Congress and the military with regard to military affairs are entitled to substantial deference, and that courts "lack the competence" to make policy decisions in the military context. *See Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986), *Rostker v. Goldberg,* 453 U.S. 57, 65, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981). But that does not mean that courts are not competent or should abdicate their responsibility to review the constitutionality of military decisions. "When Congress' exercise of one of its enumerated powers clashes with those individual liberties protected by the Bill of Rights, it is [the courts'] 'delicate and difficult task' to determine whether the resulting restriction on freedom can be tolerated." *United States v. Robel,* 389 U.S. 258, 264, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967) (citations omitted).

A court need not determine the wisdom of a particular military policy in order to determine whether that policy conflicts with the Constitution. Even in the military context, regulation of speech based on content survives constitutional scrutiny only if it is "no more than [what is] reasonably necessary to protect [a] substantial government interest." *Brown v. Glines,* 444 U.S. 348, 355, 100 S.Ct. 594, 600, 62 L.Ed.2d 540 (1980).

## A

Defendants argue that subsection (b)(2) does not offend the First Amendment because the subsection is ultimately directed solely at the prohibition of acts and gives members who reveal their homosexual "orientation" an opportunity to rebut the presumption that a member with such an "orientation" will either commit undesirable acts or has a "propensity" to commit such acts.

In advancing this argument, defendants reject old myths previously offered to justify a ban on service by homosexuals.

From the early 1920's through the 1970's, homosexuals were deemed unfit for service because homosexuality was considered a "mental illness" or a "personality disorder." *See* Prepared Statement of Dr. David F. Burrelli, S. Hrg. 103–845, Ex. JX–1 at pp.

13–14. In 1982, the Department of Defense issued a policy mandating dismissal of homosexuals in part "to prevent breaches of security" that presumably would arise if a closeted homosexual were blackmailed. *See id.* at p. 15. Even as recently as 1993, some proponents of retaining the complete ban testified that such a policy was necessary because homosexuals are more likely, as a group, "to spread infectious diseases such as hepatitis and syphilis." *See* Statement of Col. John Ripley, H.A.S.C. Hrg. 103–18, Ex. JX–2 at pp. 89–90.

The legislative record shows that the Act and the Directives are not premised on these beliefs. Defendants do not contend that the new policy was enacted in response to a finding that gay men and lesbians have physical or psychological defects rendering them unfit to serve, pose security risks, or are more likely than heterosexuals to violate a code of conduct or other rules generally. *See* Defendants' Responses to Plaintiffs' Requests for Admission, Ex. PX–13 at pp. 5–8. Indeed, defendants admit that Congress "clarified that the proscription on service has nothing to do with unjustified assumptions that homosexuals are not just as capable physically, mentally and psychologically to serve in the United States military as heterosexuals." Transcript of Defendants' Closing Statement at p. 256.

High-ranking administration officials and military officers certified the demonstrated ability of homosexuals to serve competently and conscientiously. Secretary Aspin, in presenting the administration's new policy, testified to the Department of Defense's recognition "that homosexuals have served with distinction in the Armed Forces." S. Hrg. 103–845, Ex. JX–1 at p. 702. General Norman Schwartzkopf noted that "homosexuals have served in the past and have done a great job serving their country." S. Hrg. 103–845, Ex. JX–1 at p. 612. Major Kathleen Bergeron affirmed that in her experience, homosexuals who eventually had been separated "had an honorable record and served with distinction." S. Hrg. 103–845, Ex. JX–1 at p. 612. General Colin Powell, discussing the arguments of those who believe that homosexuals should be allowed openly to serve, stated that "[t]hey note correctly that homosexuals have privately served well in the past and are continuing to serve well today." S. Hrg. 103–845, Ex. JX–1 at p. 707.

Thus, the government, including Congress, believed that the admission of homosexuals into the Services did not pose an uncontrollable risk that they would commit acts inherently dangerous to morale, good order and discipline, and unit cohesion, and manifested that belief by allowing homosexuals to enter the Services.

The government's confidence was justified by the fact that over the years thousands of homosexuals have served in the Services ably and honorably before the Act became law. By the time the Act was passed, the old myths had finally been abandoned.

But despite its recognition that homosexuals do not by their nature pose a risk to the military mission or lack competence as soldiers, the government elected to allow them to join and remain in the Services only on the condition that they remain silent regarding their status. The government justified this condition by saying that it needed to use a statement of orientation as evidence of a likelihood to engage in prohibited acts in order to forestall the commission of such acts.

To presume from a person's status that he or she will commit undesirable acts is an extreme measure. Hitler taught the world what could happen when the government began to target people not for what they had done but because of their status.

Thirty three years ago the Supreme Court held it was cruel and unusual punishment prohibited by the Eighth Amendment to subject an admitted narcotics addict to a misdemeanor prosecution on the theory that his addiction justified an inference that he had possessed or in the future would possess drugs. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). *See also Powell v. Texas,* 392 U.S. 514, 543, 88 S.Ct. 2145, 2159, 20 L.Ed.2d 1254 (1968) (Black, J., concurring) ("Punishment for a status is particularly obnoxious, and in many instances can reasonably be called cruel and unusual,

because it involves punishment for a mere propensity, a desire to commit an offense; the mental element is not simply one part of the crime but may constitute all of it.")

Robinson's status as a narcotics addict was self-acquired. How much worse it is to infer the commission of acts from one's homosexual status, which may well be acquired at birth or in early childhood. *See* John C. Gonsiorek and James D. Weinrich, eds., *Homosexuality: Research Implications for Public Policy* 2 (1991).

Defendants recognized that a policy mandating discharge of homosexuals merely because they have a homosexual orientation or status could not withstand judicial scrutiny. As Jamie Gorelick, Counsel to the Department of Defense, stated at the Senate hearing: "The reason we do not discharge people because we believe them to have a homosexual orientation is because in 1981 it was recognized that if we did have a status-based as opposed to a conduct-based rule, that it would be vulnerable to the courts." S. Hrg. 103–845, Ex. JX–1 at p. 777.

Defendants therefore designed a policy that purportedly directs discharge based on "conduct," and craftily sought to avoid the First Amendment by defining "conduct" to include statements revealing one's homosexual status. To say "I have a homosexual orientation," a mere acknowledgment of status, is thus transmogrified into an admission of misconduct, and misconduct that the speaker has the practically insurmountable burden of disproving.

As noted above, the Directives purport to distinguish between homosexual "orientation" and homosexual "propensity," defining the former as the quality of having an "abstract sexual preference for members of the same sex" and the latter as the quality of having such a preference that presumably is sufficiently concrete to indicate a "likelihood" that the preference will be acted upon.

The court regards the definition and treatment of these terms to be nothing less than Orwellian. Although the Act and the Directives are written in such a manner as to give the impression that there is a principled distinction between the two characteristics, only a brief critique will demonstrate that in practice no such distinction exists.

Neither the Act nor the Directives explain how to differentiate an "orientation" from a "propensity," although the Act's avowed policy to insure that "homosexual orientation" not be treated as a "bar" to service would seem to make such differentiation crucial. Those who formulated the policy testified that any distinction between the two is merely "hypothetical," Testimony of Counsel Gorelick, S. Hrg. 103–845, Ex. JX–1 at p. 800, and the Directives, as decreed by Congress, equate a statement of "orientation" with an admission of at least a "propensity." *See* Directives 1332.14 & 1332.30, Exs. JX–6 & JX–7, and S.Rep. 103–112, Ex. JX–15 at p. 294.

These facts seem to the court to be powerful evidence that despite their semantic gymnastics, defendants themselves did not perceive a difference between the two. Plainly they intended that the articulation of a mere "orientation" be sufficient to initiate a discharge proceeding. Thus, one who does no more than express an "orientation" is faced with the prospect of somehow showing that he or she does not have a "propensity" to engage in prohibited acts in order to avoid discharge.

The word "propensity" is generally understood and defined to mean a "natural inclination" or an "innate or inherent tendency." *Webster's Third New International Dictionary* 1817 (1986); *see also Random House Dictionary of the English Language* 1152 (1966). "Innate" means "existing in one from birth" or "inborn." *Random House* at 733; *see also Webster's* at 1165.

Defendants make much of the opportunity to rebut the presumption of propensity. But that opportunity is an *ignis fatuus.* Neither the Act nor the Directives suggest how one who is born with an innate tendency, an "orientation" or a "propensity," to commit a homosexual act can prove that he or she does not have such an orientation or propensity. Furthermore, the testimony at the Senate hearing shows that a member who admits to a homosexual orientation has only a "hypothetical" chance to escape discharge.

As stated by Ms. Gorelick, the rebuttable presumption places a "very high burden" on the member, and in a situation where "someone made the statement [of homosexuality] knowingly and was not drunk or had not lost his or her mind," it would be "very unlikely" that the burden could be overcome by the member's assertion that he or she does not engage or have a propensity to engage in prohibited acts. S. Hrg. 103–845, Ex. JX–1 at p. 772. Indeed, Ms. Gorelick testified that even if the speaker completely disclaimed his or her acknowledgement of his or her sexual orientation, asserting that "I was misunderstood, I did not mean it, it was a joke," that disclaimer would only "hypothetically suffice" to rebut the presumption. *Id.*

Thus, the policy treats a statement of homosexual orientation as proof of the case. Once such a statement is made, the speaker is judged guilty until proven innocent of committing misconduct the government considers so threatening to the military mission that a member may be discharged for it. This seems to the court a rather draconian consequence of merely admitting to an orientation that Congress has determined to be innocuous.

Defendants point to three isolated instances where Navy members have been able to escape discharge despite having stated that they were homosexual as evidence that the Act does not punish expressions of homosexual orientation but merely uses them as evidence in an effort to preclude the commission of prohibited acts. *See* Administrative Bd. Records Nos. 13, 15, & 16, Exs. DX–1, DX–2, & DX–3.

An examination of the records (such as they are) of these proceedings shows that the results were aberrations stemming from a dysfunctional application of the policy. In one, the member had said "she thought she might be gay." In another, the member had stated "I'm kind of confused about my sexual preference." And in the third the member had said he was homosexual only in what he thought was a confidential session with a Navy counselor who tried to make him "comfortable" and "as free as possible" so as to get to the "root" of the member's problems.

In each of these cases, the member stated at the discharge hearing that he or she was gay, but was apparently able to escape discharge by stating that he or she had not engaged and did not intend to engage in "homosexual acts." But Congress' specific intent was that "a member cannot rebut the presumption simply through a promise to adhere to military standards of conduct in the future, nor can the member rebut the presumption by a statement to the effect that he or she has a propensity towards homosexuality but has not acted on it." S.Rep. 103–112, Ex. JX–15 at p. 294.

These three atypical results are obviously aberrations that cannot be taken to show that the Act holds out any realistic opportunity to rebut the presumption.

■ The plain fact is that subsection (b)(2) burdens speech based solely on its content by subjecting the member to a discharge process in which the member has only at best a hypothetical chance to escape separation. The Act works to discharge or subject to discharge proceedings members who possess no more than an "orientation" regardless of whether they have engaged in or demonstrated a likelihood of engaging in prohibited acts, and thus reaches speech that does not indicate acts.

This court concludes that under the First Amendment a mere statement of homosexual orientation is not sufficient proof of intent to commit acts as to justify the initiation of discharge proceedings.

B

In this court defendants argued something not even mentioned in the fifteen findings of the Act. In substance, they contended that a majority of the heterosexuals in the Services would not, for a variety of reasons, like to know that there were homosexuals serving with them and that this would result in a serious detriment to "unit cohesion." Defendants now say that the Services are justified in deferring to this feeling of heterosexuals by imposing silence on homosexuals.

Defendants' advancement of this alternative theory to justify the Act indicates that, once Congress decided to try to get all

known homosexuals out of the Services, the chief concern was to draft legislation to insure that the enactment would survive judicial review. *See also* Testimony of Counsel Gorelick and Gen. John P. Otjen, S. Hrg. 103–845, Ex. JX–1 at pp. 775–78, 812–21, 829–30. The Committee hearings show that legal counsel thought the best way to do this was to pretend that the concern was over, not the mere presence of homosexuals in the Services, but their potential acts. According to counsel, if the Act provided forthrightly that open homosexuals shall be banned because heterosexuals will not stand for them, it would be vulnerable under the Constitution of the United States. *See* Testimony of Counsel Gorelick, S. Hrg. 103–845, Ex. JX–1 at p. 777.

So the lawyers evolved the Byzantine and complex provisions described above. The Act was designed to say nothing about heterosexual animosity towards homosexuals. The Act's fifteen findings avoid using a single word about heterosexuals, and fail to say what, if any, effect the reactions of heterosexuals may have on unit cohesion.

Those who opposed the removal of the total ban on homosexuals and testified at the hearings were more candid. They said that the concern was with the potential reaction of heterosexuals if they knew who were the homosexuals serving with them.

 Although the Act's findings are silent as to the response of heterosexuals to the presence of known homosexuals in the Services, the court will analyze the Act as if it said that a statement of homosexual status was in itself an evil because heterosexuals would not like to hear it and would react so as to damage unit cohesion. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975) (courts need not "accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation").

There certainly was much testimony at the Committee hearings, particularly from generals and other high-ranking officers, opposing any lifting of the ban on homosexuals because of the expected reactions of heterosexuals. It is fair to say that the bulk of the anecdotal testimony described how heterosexuals would be prejudiced against homosexuals because their "lifestyles" or "values" differed from the "traditional" moral or religious "values" of heterosexuals. *See, e.g.,* Testimony of Maj. Bergeron, S. Hrg. 103–845, Ex. JX–1 at pp. 630–31 (expressing concern that members' children "be exposed to that lifestyle"), Testimony of Capt. Gordon Holder, S. Hrg. 103–845, Ex. JX–1 at p. 544 (questioning ability to lead subordinates "in an area ... basically against [his] moral standards"); Testimony of Comm. James Pledger, S. Hrg. 103–845, Ex. JX–1 at pp. 541–42 (reporting that significant number of his crew "took exception" to lifting ban "based on moral convictions").

General John P. Otjen, a staunch opponent of any lifting of the ban and the chairman of the Military Working Group that recommended the policy that eventually became the Act, sounded a theme repeatedly stated by high-ranking officers that "when somebody identifies themselves as homosexual" "that is disruptive to unit cohesion...." S. Hrg. 103–845, Ex. JX–1 at p. 780. *See also id.* at p. 821 ("[B]ased on my experience, [a] statement [of homosexual orientation] alone will cause disruption within the unit.").

General Schwartzkopf testified that "[t]he introduction of an open homosexual into a small unit immediately polarizes that unit." S. Hrg. 103–845, Ex. JX–1 at pp. 595–96. *See also* S.Rep. 103–112, Ex. JX–15 at pp. 279–80. General Powell said that "[h]omosexuals over history who have been willing to keep their orientation private have been successful members ...," S. Hrg. 103–845, Ex. JX–1 at p. 708, but that "the presence of open homosexuality would have an unacceptable detrimental and disruptive impact on the cohesion, morale and esprit of the Armed Forces." *Id. See also* Sen.Rep. 103–112, Ex. JX–15 at p. 278. The Report of the Association of the United States Army stated: "Heterosexual animosity toward known homosexuals can cause latent or even overt hostility, resulting in degradation of team or unit esprit." H.A.S.C. Hrg. 103–18, Ex. JX–2 at p. 337.

978

This heterosexual animosity towards homosexuals is by its terms based on irrational prejudices. But the government advances two arguments to attempt to refute the fact that the policy of requiring secrecy was based on irrational stereotypes.

■ First, they say that the policy "seeks to accommodate the privacy interests of servicemembers."

This seems to the court the most incongruous of arguments. After passage of the Act the showers, the latrines and the barracks became no more private than they were before. As defendants say, "Privacy is extremely limited in the military."

To "accommodate" the privacy of heterosexuals presumably means, for example, to keep their naked bodies safe in the showers from the stares of homosexuals. But if indeed there are homosexuals who wish to peek at naked bodies, they might do so quite as readily when their orientation is a secret as when it is open. The only difference will be that heterosexuals will not know which of their servicemates are homosexuals, and heterosexuals will have reason to have a generalized suspicion of everyone in the showers, hardly a circumstance likely to increase "cohesion."

To suggest to heterosexuals that the secrecy policy will "accommodate" their privacy interests is to attempt to mislead them. They are not dunces or ostriches. They can hardly be unaware that because of the passage of the Act homosexuals are serving with them.

■ Second, defendants contend that the policy somehow addresses the concern about "sexual tension" in the unit. The argument is based on the proposition that homosexuals, following their "tendencies," will behave in improper ways that will give rise to such tension.

This was an argument advanced before the Senate Committee in support of the total ban on homosexuals. See, e.g., S. Hrg. 103–845, Ex. JX–1 at pp. 535–36 (testimony of Fleet Master Chief Ronald Carter), pp. 763–64 (statement of Gen. Gordon Sullivan), pp. 604–05 (testimony of Maj. Bergeron). It can hardly have force now when homosexuals are not banned and will be serving in units. There is no reason to believe that such improper behavior, if it occurs, would be more likely to occur because a homosexual had admitted his orientation rather than kept it a secret.

Moreover, inappropriate behavior by a homosexual, whether in the closet or not, is susceptible of control by the general regulations. The Uniform Code of Military Justice, 10 U.S.C. § 801 et seq., contains numerous provisions that target such misconduct, prohibiting rape, 10 U.S.C. § 920, sexual harassment, 10 U.S.C. § 893, and fraternization, 10 U.S.C. § 934.

There was, of course, evidence presented to Congress to the effect that the presence of individuals who acknowledged their homosexual orientation would cause no significant breakdown in cohesion. In a report commissioned by Secretary Aspin, an interdisciplinary team of researchers from the National Defense Research Institute of the RAND Corporation (the RAND Group) concluded that "although some disruptions might result from having acknowledged homosexuals serving in the military," "the experience of analogous organizations ... suggests that any increase is likely to be quite small." RAND National Defense Research Institute, Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment (1993) (the RAND Report), Ex. PX–1 at p. xxiv. The RAND Group noted that in Canada, Israel, the Netherlands, and Norway, "countries that have policies of complete nondiscrimination," "no serious problems were reported concerning the presence of homosexuals in the force." RAND Report, Ex. PX–1 at p. 14.

A report by the United States General Accounting Office (the GAO) in 1992 also recounted that analogous organizations that have "accepted homosexuals into their ranks ... have generally not reported adverse impacts." GAO, Report to Congressional Requesters, Defense Force Management: DoD's Policy on Homosexuality (Jun.1992), Ex. PX–5 at p. 43.

Furthermore, the RAND Group noted that although the military had expressed in the 1940's similar, indeed almost identical, fears

about the reactions of white members if there was racial integration of the Services, in fact integration "did not 'destroy' unit cohesion and military effectiveness." RAND Report, Ex. PX–1 at p. 189.

While the empirical evidence developed by neutral and objective organizations such as the RAND Group supports the conclusion that any disruption would probably be quite small, the court will assume *arguendo* that Congress could have made a finding in the Act that the reactions of heterosexuals would have a larger impact. But even if the Act had included such a finding, there are factors other than those mentioned in the hearings that cast doubt on any such conclusion.

What the court deems extraordinary is the almost total lack of concern evidenced in the Congressional hearings and the Committee reports as to the impact on unit cohesion of the attempt to enforce secrecy on homosexuals and to enlist them in the perpetration of a hoax on heterosexuals. Common sense suggests that a policy of secrecy, indeed what might be called a policy of deception or dishonesty, will call unit cohesion into question.

If there is one thing that is undisputed and seems self-evident, it is that cohesion depends on mutual trust within the unit. The honor code for servicemembers provides that they will not lie or cheat, and for good reason. Honesty is a quality that attracts respect. Secrecy and deception invite suspicion, which in turn erodes trust, the rock on which cohesion is built.

The policy of the Act is not only inherently deceptive. It also offers powerful inducements to homosexuals to lie. An enlisted member may ask another enlisted member his or her sexual orientation. Testimony of Counsel Gorelick and Gen. Otjen, S. Hrg. 103–845, Ex. JX–1 at pp. 810–11. It is true that a homosexual may answer "no comment." But a homosexual who answers truthfully is subject to discharge proceedings. A heterosexual is not. The pressure to lie is obvious.

There are no findings, even in the Committee reports, assessing whether a policy of secrecy and deception is more or less deleterious to unit cohesion than would be a policy of openness and honesty. The court has no findings before it calculating the net effect of the policy on unit cohesion.

The task of this court is to determine the constitutionality of the policy adopted by Congress, not its morality. But heterosexuals and homosexuals alike would be entitled to think it demeaning and unworthy of a great nation to base a policy on pretense rather than on truth. To invite someone with a homosexual orientation to join the Services, then to throw that person out solely because that orientation is revealed from something he or she said, and finally to pretend that the discharge was not because of the person's orientation, might appear to all members, heterosexual and homosexual, less than honorable, with incalculable effect on "high morale, good order and discipline, and unit cohesion."

Even if the First Amendment were to tolerate the prohibition of a truthful self-identification by a homosexual because it offends the sensibilities of some heterosexuals it surely would require a legislative finding that the consequences of disclosure would be infinitely more serious than anything revealed in the record before Congress. Even General Otjen conceded that the Services would fulfill their mission if homosexuals were permitted to reveal their orientation. *See* Deposition of General Otjen, Ex. PX–19 at p. 139 (confirming that subordinate members of the Services follow their orders whether or not they like them). *See also* Testimony of Gen. Calvin Waller, S. Hrg. 103–845, Ex. JX–1 at p. 401 ("If the ultimate decision is to allow openly declared homosexuals to serve in the Armed Forces, I am confident that the military leadership, as well as the military personnel, will salute and make the best of that situation.")

In any event the Supreme Court has held that the First Amendment will not countenance the proscription of the expression of an idea because others find that idea repugnant.

■ "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the

idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989). *See also Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949); *Healy v. James,* 408 U.S. 169, 187–88, 92 S.Ct. 2338, 2349, 33 L.Ed.2d 266 (1972); *Simon & Schuster, supra,* 502 U.S. at 118, 112 S.Ct. at 509.

This principle applies with particular force where, as here, heterosexuals find the mere idea of homosexual orientation disagreeable based largely on irrational stereotypes.

The court holds that subsection (b)(2) of the Act and its accompanying Directives are invalid under the First Amendment.

### EQUAL PROTECTION

The due process clause of the Fifth Amendment makes binding upon the federal government the Fourteenth Amendment's command that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *See Bolling v. Sharpe,* 347 U.S. 497, 498–99, 74 S.Ct. 693, 694 (1954).

 The court analyzes Fifth Amendment equal protection challenges by the same standards as those applicable to claims of violation of the equal protection clause of the Fourteenth Amendment. *See Weinberger, supra,* 420 U.S. at 638 n. 2, 95 S.Ct. at 1228 n. 2.

 Because the Act gives to persons of one status, heterosexual, the chance to exercise the fundamental right of free speech and prohibits it to those of another status, homosexual, defendants must at least show that the policy is "tailored to serve a substantial governmental interest." *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972).

For the reasons discussed above, whether the government intended that subsection (b)(2) prevent the commission of prohibited "acts" or appease heterosexual prejudices, defendants fail to make the required showing.

 Even if defendants do believe that heterosexual servicemembers will be so upset by a coworker's mere statement of homosexuality as not to work cooperatively in the unit, such a belief does not justify a discriminatory policy.

 "Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private [ ] prejudice that they assume to be both widely and deeply held." *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984), *quoting Palmer v. Thompson,* 403 U.S. 217, 260–61, 91 S.Ct. 1940, 1962–63, 29 L.Ed.2d 438 (1971) (White, J., dissenting). Congress may not enact discriminatory legislation because it desires to insulate heterosexual servicemembers from statements that might excite their prejudices.

The court holds that subsection (b)(2) of the Act and its accompanying Directives violate the equal protection component of the Fifth Amendment.

### CONCLUSION

The court declares subsection (b)(2) of the Act, 10 U.S.C. § 654(b)(2), and the Directives implementing that subsection invalid under the First and Fifth Amendments and enjoins defendants from enforcing them against plaintiffs.

So ordered.