88 F.3d 1280
 71 Fair Empl.Prac.Cas. (BNA) 419, 65 USLW 2030
 Lieutenant Colonel Jane ABLE, Petty Officer Robert Heigle,
First Lieutenant Kenneth Osborn, Sergeant Steven Spencer,
Lieutenant Richard von Wohld, and Seaman Werner Zehr,
Plaintiffs-Appellees/Cross-Appellants,
v.
UNITED STATES of America, William J. Perry, Secretary of
Defense, Federico F. Pena, Secretary of
Transportation,
Defendants-Appellants/Cross-Appellees.
 Nos. 799, 1082, Dockets 95-6111, 95-6141.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 16, 1996.
Decided July 1, 1996.
 
 Edwin S. Kneedler, Deputy Solicitor General, Washington, DC (Zachary W. Carter, United States Attorney, Brooklyn, NY, Frank W. Hunger, Assistant Attorney General, Anthony J. Steinmeyer, John C. Hoyle, E. Roy Hawkens, Edward Himmelfarb, Lowell V. Sturgill Jr., Department of Justice, Washington, DC, Maj. Douglas Mickle, United States Army, Arlington, VA, on the brief), for Defendants-Appellants/Cross-Appellees.
 Matthew A. Coles, New York City (Ruth E. Harlow, Marc E. Elovitz, American Civil Liberties Union Foundation, Beatrice Dohrn, Evan Wolfson, Lambda Legal Defense & Education Fund, David H. Braff, Michael Lacovara, Penny Shane, Edward Harris, Ann Kenny, Michael Johnson, New York City, on the brief), for Plaintiffs-Appellees/Cross-Appellants.
 Melissa Wells-Petry, Washington, DC, on the brief, for Amicus Curiae Family Research Council.
 Arthur A. Schulcz, Sr., Vienna, VA, on the brief, for Amici Curiae Iamoai, Inc. and Iota Legal Defense Fund.
 Karen Honeycutt, James D. Esseks, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, on the brief, for Amicus Curiae Servicemembers Legal Defense Network.
 Franklin Poul, Dana B. Klinges, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, PA, on the brief, for Amicus Curiae Unitarian Universalist Association.
 Chai R. Feldblum, Washington, DC, on the brief, for Amici Curiae Human Rights Campaign Fund, Union of American Hebrew Congregations, American Jewish Congress, United Church of Christ Office for Church in Society, NOW Legal Defense and Education Fund, Center for Women Policy Studies, National Gay and Lesbian Task Force, National Lesbian and Gay Law Association, and Gay and Lesbian Advocates and Defenders.
 Before: FEINBERG, WALKER, and LEVAL, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 This appeal concerns the constitutionality of 10 U.S.C. § 654, the popularly termed "Don't Ask, Don't Tell" policy governing the participation of homosexuals in military service, and the accompanying directives issued by the Department of Defense ("DoD") and the Secretary of Transportation. The genesis of this legislation lay in a much-publicized debate, both in government and society at large, over whether homosexuals should be permitted to serve in the military and under what conditions such service should take place. Although there has been a great deal of litigation in the federal courts over the former policy, we are one of the first appellate courts to address the recent Congressional enactment, which is the first statute to address directly whether and when homosexuals may serve in the military.
 
 
 2
 Defendants United States of America, William J. Perry, and Federico F. Pena (collectively the "United States" or the "government") appeal from the judgment of the United States District Court for the Eastern District of New York (Eugene H. Nickerson, District Judge ), which held that 10 U.S.C. § 654(b)(2) (the "statements presumption") (enacted as § 571(b)(2) of the National Defense Authorization Act for the Fiscal Year 1994 (the "Act")) violated both the Free Speech Clause of the First Amendment to the Constitution and the Equal Protection Clause of the Fourteenth Amendment, as applied against the United States under the Fifth Amendment. See Able v. United States, 880 F.Supp. 968 (E.D.N.Y.1995). The government contends that the district court failed to accord the judgments of Congress and the military proper deference in deciding the eligibility requirements for military service and that, under the correct standard, § 654(b)(2) is constitutional. The government also argues that plaintiffs' action is barred by their failure to exhaust their administrative remedies.
 
 
 3
 Plaintiffs Lieutenant Colonel Jane Able,[1] Petty Officer Robert Heigle,[2] First Lieutenant Kenneth Osborn, Sergeant Steven Spencer, Lieutenant Richard von Wohld, and Seaman Werner Zehr, who are all homosexuals serving in either the armed forces or the Coast Guard, cross-appeal from so much of the district court's judgment as dismissed their claim that 10 U.S.C. § 654(b)(1) (the "acts prohibition") (enacted as § 571(b)(1) of the Act) violates the First and Fifth Amendments.[3] The plaintiffs argue that they do have standing and that this court must address the constitutionality of § 654(b)(1) because the government's argument that the statements presumption of § 654(b)(2) is constitutional is premised on the validity of the acts prohibition of § 654(b)(1). The government does not dispute that the plaintiffs have standing, but contends that the district court properly exercised its discretion in not reaching the challenge to § 654(b)(1) and that, in any event, § 654(b)(1) is constitutional.
 
 
 4
 We agree with the plaintiffs that they have standing to challenge § 654(b)(1). We also agree that the plaintiffs were not required to exhaust their administrative remedies before bringing this action. We reject, however, the district court's reasons for holding § 654(b)(2) to be unconstitutional and, for the reasons stated below, we remand the case to the district court for further consideration of the plaintiffs' challenges to § 654(b)(1) and (2) in accordance with this opinion.
 
 I.
 A.
 
 5
 In January 1993, President Clinton directed the Secretary of Defense to review the DoD's policy (the "former policy") concerning the service of homosexuals in the military. Under the former policy, promulgated by the DoD in 1982, see 47 Fed.Reg. 10,162 (1982), a service member was to be separated from the armed forces
 
 
 6
 if one or more of the following approved findings is made:
 
 
 7
 (1) The member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are approved further findings that:
 
 
 8
 (a) Such conduct is a departure from the member's usual and customary behavior;
 
 
 9
 (b) Such conduct under all the circumstances is unlikely to recur;
 
 
 10
 (c) Such conduct was not accomplished by use of force, coercion, or intimidation by the member during a period of military service;
 
 
 11
 (d) Under the particular circumstances of the case, the member's continued presence in the Service is consistent with the interest of the Service in proper discipline, good order, and morale; and
 
 
 12
 (e) The member does not desire to engage in or intend to engage in homosexual acts.
 
 
 13
 (2) The member has stated that he or she is a homosexual or bisexual unless there is a further finding that the member is not a homosexual or bisexual.
 
 
 14
 (3) The member has married or attempted to marry a person known to be of the same biological sex (as evidenced by the external anatomy of the persons involved) unless there are further findings that the member is not a homosexual or bisexual and that the purpose of the marriage or attempt was the avoidance or termination of military service.
 
 
 15
 32 C.F.R. pt. 41, app. A, pt. 1, at H.c (1992).
 
 
 16
 President Clinton's directive prompted not only a DoD review but extensive hearings in both houses of Congress on the question of military service by homosexuals. See, e.g., S.Rep. No. 112, 103d Cong., 1st Sess. 269-70 (1993). Several months later, President Clinton announced a new policy, which formed the basis for § 654. In the Act, Congress grounded its decision to enact § 654 in fifteen separate findings:
 
 
 17
 (1) Section 8 of article I of the Constitution of the United States commits exclusively to the Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for the government and regulation of the land and naval forces.
 
 
 18
 (2) There is no constitutional right to serve in the armed forces.
 
 
 19
 (3) Pursuant to the powers conferred by section 8 of article I of the Constitution of the United States, it lies within the discretion of the Congress to establish qualifications for and conditions of service in the armed forces.
 
 
 20
 (4) The primary purpose of the armed forces is to prepare for and to prevail in combat should the need arise.
 
 
 21
 (5) The conduct of military operations requires members of the armed forces to make extraordinary sacrifices, including the ultimate sacrifice, in order to provide for the common defense.
 
 
 22
 (6) Success in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion.
 
 
 23
 (7) One of the most critical elements in combat capability is unit cohesion, that is, the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members.
 
 
 24
 (8) Military life is fundamentally different from civilian life in that--
 
 
 25
 (A) the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion, require that the military community, while subject to civilian control, exist as a specialized society; and
 
 
 26
 (B) the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.
 
 
 27
 (9) The standards of conduct for members of the armed forces regulate a member's life for 24 hours each day beginning at the moment the member enters military status and not ending until that person is discharged or otherwise separated from the armed forces.
 
 
 28
 (10) Those standards of conduct, including the Uniform Code of Military Justice, apply to a member of the armed forces at all times that the member has a military status, whether the member is on base or off base, and whether the member is on duty or off duty.
 
 
 29
 (11) The pervasive application of the standards of conduct is necessary because members of the armed forces must be ready at all times for worldwide deployment to a combat environment.
 
 
 30
 (12) The worldwide deployment of United States military forces, the international responsibilities of the United States, and the potential for involvement of the armed forces in actual combat routinely make it necessary for members of the armed forces involuntarily to accept living conditions and working conditions that are often spartan, primitive, and characterized by forced intimacy with little or no privacy.
 
 
 31
 (13) The prohibition against homosexual conduct is a long-standing element of military law that continues to be necessary in the unique circumstances of military service.
 
 
 32
 (14) The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.
 
 
 33
 (15) The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.
 
 
 34
 10 U.S.C. § 654(a). Based on these findings, Congress provided that a service member would be separated from the armed forces, pursuant to regulations to be promulgated by the Secretary of Defense under § 654(b),
 
 
 35
 if one or more of the following findings is made and approved in accordance with procedures set forth in such regulations:
 
 
 36
 (1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are further findings, made and approved in accordance with procedures set forth in such regulations, that the member has demonstrated that--
 
 
 37
 (A) such conduct is a departure from the member's usual and customary behavior;
 
 
 38
 (B) such conduct, under all the circumstances, is unlikely to recur;
 
 
 39
 (C) such conduct was not accomplished by use of force, coercion, or intimidation;
 
 
 40
 (D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
 
 
 41
 (E) the member does not have a propensity or intent to engage in homosexual acts.
 
 
 42
 (2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.
 
 
 43
 (3) That the member has married or attempted to marry a person known to be of the same biological sex.
 
 
 44
 10 U.S.C. § 654(b). On November 30, 1993, President Clinton signed the Act into law and the DoD subsequently issued new directives implementing the policy. See DoD Directive No. 1304.26 (qualification standards for enlistment, appointment, and induction); DoD Directive No. 1322.18 (military training); DoD Directive No. 1332.14 (separation of enlisted personnel); DoD Directive No. 1332.30 (separation of regular commissioned officers); DoD Instruction No. 5505.8 (investigations of sexual misconduct by DoD law enforcement organizations).
 
 
 45
 A comparison of the former policy with the Act and the new Directives (the "new policy") reveals that the grounds for separation under the two are virtually identical. Both policies require the separation of a service member when he or she (i) has engaged in a homosexual act, (ii) has stated that he or she is a homosexual or bisexual, or (iii) has married or attempted to marry a person known to be of the same biological sex. Each policy also provides for exceptions to the first and second grounds for separation if the appropriate tribunal makes certain findings.
 
 
 46
 Nevertheless, the new policy did result in substantial changes in several other areas. First, it clarifies that its purpose is to ensure that homosexual acts will not be committed by service members. It is not aimed at the separation of homosexuals based on status alone. DoD Directive No. 1332.14, encl. 3, pt. 1, at H.1.b(2). Second, the new policy sharply restricts the circumstances under which the military authorities may initiate an investigation of a service member. For instance, Instruction No. 5505.8 restricts the ability of the military to investigate its own members for homosexual conduct without some cause, stating that "[n]o ... DoD law enforcement organization shall conduct an investigation solely to determine whether a Service member is a heterosexual, a homosexual, or a bisexual" and that a "DoD law enforcement organization shall not initiate a criminal investigation into adult private consensual sexual misconduct where such misconduct is the only offense involved," unless (1) a "commander determines that there is credible information of adult private consensual sexual misconduct," or (2) the commander or director of a defense criminal investigation organization determines that there is credible information of such conduct.
 
 
 47
 Finally, the new policy also requires that all applicants, as well as all service members, be informed of the existence and content of the new policy. Military authorities are restricted as to what, if anything, they may ask applicants concerning their sexual orientation:
 
 
 48
 Applicants for enlistment, appointment, or induction shall not be asked or required to reveal whether they are heterosexual, homosexual or bisexual. Applicants also will not be asked or required to reveal whether they have engaged in homosexual conduct, unless independent evidence is received indicating that an applicant engaged in such conduct or unless the applicant volunteers a statement that he or she is a homosexual or bisexual, or words to that effect.
 
 Directive No. 1304.26, encl. 1, at B.8.a.[4]
 B.
 
 49
 On March 7, 1994, the plaintiffs filed this action to challenge the constitutionality of § 654. On that date they also moved for a temporary restraining order and a preliminary injunction. Soon thereafter, the government initiated an investigation of Heigle, based on his admission in the complaint in this action that he was a homosexual. The government opposed the plaintiffs' motion for preliminary relief and filed its own motion to dismiss the complaint for failure to state a claim. On April 4, 1994, the district court rejected the government's argument that the plaintiffs had failed to exhaust their administrative remedies and preliminarily enjoined the government from investigating, discharging, or taking any other adverse or punitive actions against any of the plaintiffs based on their identification of themselves as homosexuals in connection with this litigation. See Able v. United States, 847 F.Supp. 1038 (E.D.N.Y.1994). Subsequently, the government informed the plaintiffs that it intended to initiate separation proceedings against two other plaintiffs, Spencer and Zehr, based on their admissions of their homosexuality prior to the initiation of this lawsuit. Thereafter, on June 3, 1994, the district court issued a second order enjoining the government from investigating, discharging, or taking any other adverse or punitive actions against the plaintiffs based on their identification of themselves as homosexuals, whether or not connected to this litigation. Able v. United States, No. 94 CV 0974 (E.D.N.Y. June 3, 1994).
 
 
 50
 The United States appealed from the district court's orders. In a per curiam opinion, we remanded the case to the district court. See Able v. United States, 44 F.3d 128 (2d Cir.1995) (per curiam). We determined that the district court had applied the wrong standard in deciding to issue the preliminary injunctions. Nonetheless, we stayed the lifting of the preliminary injunctions pending an expedited trial on the merits, to occur within three months of our decision. Id. at 132-33.
 
 
 51
 On September 22, 1994, while the appeal of the preliminary injunction orders was pending in this court, the district court ruled on the government's motion to dismiss. The district court again rejected the government's exhaustion argument and declined to dismiss the plaintiffs' equal protection, free speech, and expressive association claims. Able v. United States, 863 F.Supp. 112, 114-15 (E.D.N.Y.1994). However, the district court did find in the government's favor that (i) the plaintiffs lacked standing to bring a claim that the Act violates their rights to intimate association and (ii) the Act was not unconstitutionally overbroad or vague. Id. at 115-16. The government sought, and was denied, certification for an immediate appeal. See Able v. United States, 870 F.Supp. 468 (E.D.N.Y.1994).
 
 
 52
 Following the remand from this court, the district court set the case for trial. Before trial, the district court entered judgment dismissing the plaintiffs' challenge to *1288s 654(b)(1) and (3), as well as their claim that the Act violated their rights to expressive association, on the ground that the plaintiffs lacked standing to bring those claims.[5] Able v. United States, No. 94 CV 0974, 1995 WL 116322 (E.D.N.Y. Mar. 14, 1995). The district court tried the case over four days beginning on March 13, 1995 and, on March 30, issued its memorandum and order holding that § 654(b)(2) violated both the First and Fifth Amendments. This appeal and cross-appeal followed.
 
 II.
 
 53
 The government first argues that this action is barred because the plaintiffs failed to challenge the Act through separation proceedings.
 
 A.
 
 54
 It is the general rule that " 'a party may not seek federal judicial review of an adverse administrative determination until the party has first sought all possible relief within the agency itself.' " Howell v. INS, 72 F.3d 288, 291 (2d Cir.1995) (quoting Guitard v. United States Secretary of Navy, 967 F.2d 737, 740 (2d Cir.1992)).[6] However, we have also held that exhaustion " 'may not be required when: (1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question.' " Id. (quoting Guitard, 967 F.2d at 741).[7] The district court found that exhaustion was not required because "the plaintiffs raise constitutional questions and irreparable injury [would] occur." Able, 847 F.Supp. at 1043; see also Able, 863 F.Supp. at 114. The government argues that the plaintiffs have failed to show an irreparable injury that would obviate the need for exhaustion and that the exhaustion doctrine applies to the consideration of the constitutional questions raised in this case.
 
 
 55
 The Supreme Court has been inconsistent in its jurisprudence concerning the "constitutionality" exception to the exhaustion requirement. As the government notes, the Court held in W.E.B. DuBois Clubs of Am. v. Clark, 389 U.S. 309, 312, 88 S.Ct. 450, 452, 19 L.Ed.2d 546 (1967) (per curiam), that the presence of constitutional issues alone does not create an automatic exception to the exhaustion requirement. On the other hand, the Court has also indicated that "[c]onstitutional questions obviously are unsuited to resolution in administrative hearing procedures" and that "when constitutional questions are in issue, the availability of judicial review is presumed." Califano v. Sanders, 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977). However, we need not determine whether that exception applies in this case, for it is clear to us that the exception to the exhaustion requirement for irreparable injury does apply.
 
 
 56
 The plaintiffs here are alleging violations of their First Amendment right to free speech. Both the Supreme Court and this court have held that even minimal impairments on this right create irreparable injury. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Paulsen v. County of Nassau, 925 F.2d 65, 68 (2d Cir.1991) (same). The government attempts to distinguish these precedents on the ground that the First Amendment has a "different and substantially less stringent application in the military than it does in civilian life." Brief for the Appellants/Cross-Appellees at 15. This argument, however, places the cart before the horse. As we note herein, the First Amendment is indeed considerably less restrictive on government action in the military than in other spheres. But, in conducting our "irreparable injury" inquiry, we must assume, arguendo, unconstitutional government action and, under this assumption, the violation of the First Amendment is no less harmful to a military plaintiff than a civilian one.
 
 
 57
 Even if the irreparable injury exception did not apply, we believe that the district court would still have been required to apply the futility exception to the exhaustion requirement. The plaintiffs challenge the Act on its face. Such a challenge does not necessitate significant fact-finding for its resolution. See, e.g., United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (In a facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid."). The plaintiffs do not argue that the Act is invalid only as applied to them; instead, they admit that they are homosexual, and they do not claim that the exceptions to separation under the Act will apply to them. At trial, the government did offer into evidence information regarding three administrative proceedings in which military members had been retained by the military despite making statements identifying themselves as homosexuals. But, as the district court noted, in each one of those cases the member had stated that he or she had not engaged in and did not intend to engage in homosexual acts. Able, 880 F.Supp. at 976. The plaintiffs make no such contention and, because none of the administrative boards before which the plaintiffs would appear has the power to declare the Act unconstitutional, there is no realistic possibility that such proceedings would result in anything other than the plaintiffs' discharge. Accordingly, we find that the plaintiffs need not exhaust their administrative remedies because such proceedings would be futile. See Steffan v. Cheney, 733 F.Supp. 115, 119-20 (D.D.C.1989). Compare Steffan v. Perry, 41 F.3d 677, 694-95 (D.C.Cir.1994) (en banc) (noting that exhaustion might be required in "as-applied" challenge to former policy), with Meinhold v. United States Dep't of Defense, 34 F.3d 1469, 1477 (9th Cir.1994) (applying futility exception in another "as-applied" challenge).
 
 B.
 
 58
 Although the government styles its argument as one for the exhaustion of remedies, the government actually contends that the suit is premature because the military has not yet definitively applied the policy to the plaintiffs and they will have the opportunity to present witnesses and evidence before an administrative board. We view this as an invocation of the ripeness doctrine, the purpose of which "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreement over administrative policies, and also to protect those agencies from judicial interference until an administrative decision has been formalized and its effect felt in a concrete way by the challenging parties." Abbott Lab. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Ripeness reflects the concerns, articulated by the government here, that courts (1) involve themselves only in "problems that are real and present or imminent" and (2) not "intrude excessively on the policymaking domains of the politically accountable Branches" by allowing judicial review "only when the government's position has crystallized to the point at which a court can identify a relatively discrete dispute." 2 Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 15.12, at 360 (2d ed.1994). Thus, "[a]t its core, the ripeness requirement is based on the jurisdictional limit in Article III." Id.
 
 
 59
 We have looked to a variety of factors in determining whether a case is ripe for judicial determination, including (1) whether the issue to be reviewed is more legal or factual in nature, (2) whether the agency action is likely to have an immediate and substantial impact upon the complaining party, (3) whether judicial review would delay or impede effective enforcement of the relevant administrative scheme, (4) whether the agency's actions are final, and (5) whether an adequate factual record has been established. See, e.g., Occidental Chem. Corp. v. FERC, 869 F.2d 127, 129 (2d Cir.1989); Seafarers Int'l Union v. United States Coast Guard, 736 F.2d 19, 25-27 (2d Cir.1984); Aquavella v. Richardson, 437 F.2d 397, 403-04 (2d Cir.1971). The Supreme Court has articulated the gravamen of the inquiry to be "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Lab., 387 U.S. at 149, 87 S.Ct. at 1515; see Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation, 79 F.3d 1298, 1305 (2d Cir.1996).
 
 
 60
 We have no difficulty in concluding that this controversy is ripe for judicial consideration. First, because this is a facial challenge to the Act, the issues before us are primarily legal, and not factual, in nature. In a facial challenge, we need only consider whether there are any circumstances under which the prohibitions of the Act are permissible in order to uphold the Act. We are not called upon by either party to consider any facts particular to the plaintiffs' situations. Further, the government has promulgated regulations interpreting the Act, which are entitled to deference from us. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). Resort to administrative proceedings would not result in further clarification of the Act beyond that which the government has already provided.
 
 
 61
 We also have little difficulty in finding that, if the plaintiffs' constitutional claims have merit, the plaintiffs would suffer greater hardship if judicial review is withheld than would the government if it is not. As we noted above, the plaintiffs are alleging a violation of their free speech rights and both this court and the Supreme Court have found such violations to constitute irreparable injury. The government does not point to any similar irreparable injury that it suffers by allowing this litigation to go forward.
 
 
 62
 Presumably, the government suffers some injury because at least three of the plaintiffs would have been either discharged or subject to separation proceedings had the district court not entered its preliminary injunctions. But the government has not advanced any such claim on this appeal and, in any event, such an allegation would be frivolous as to Able because the government does not know her identity. Indeed, under the government's theory, Able is presented with an impossible choice: she must either (1) come forward, publicly identify herself as a homosexual, and inevitably be discharged, or (2) stay silent, never identify herself as a homosexual, and forever be barred from asserting her alleged free speech rights. Accordingly, because this case is ready for judicial determination and because the plaintiffs necessarily would be harmed were we to withhold judicial review, we find that the ripeness requirement has been met.
 
 III.
 
 63
 Section 654(b)(1) provides that a service member who "has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts" will be discharged unless there is a further finding that, among other things, "the member does not have a propensity or intent to engage in homosexual acts." The plaintiffs challenge this prohibition on the ground that it violates their constitutional right to equal protection of the laws.
 
 
 64
 The district court dismissed the plaintiffs' challenge on the ground that they lacked standing. See Able, 1995 WL 116322 at * 3-4. The plaintiffs argue that they have standing and that, because the government's free speech argument in support of the constitutionality of § 654(b)(2) is founded upon the premise that the prohibition on acts under subsection (b)(1) is constitutional, we must necessarily reach that issue in order to rule upon the constitutionality of subsection (b)(2). The government does not deny that the plaintiffs have standing, but posits that the district court properly exercised its discretion in refusing to reach the § 654(b)(1) issue because the case had developed as a challenge only to § 654(b)(2). Alternatively, the government contends that § 654(b)(1) is constitutional.A.
 
 
 65
 To satisfy the constitutional requirement of standing, a plaintiff must demonstrate (1) "an injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal quotations omitted); see Rockefeller v. Powers, 74 F.3d 1367, 1375-76 (2d Cir.1995), cert. denied, --- U.S ----, 116 S.Ct. 1703, 134 L.Ed.2d 802 (1996). To show an "injury in fact," the plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560, 112 S.Ct. at 2136 (internal quotations and citations omitted).
 
 
 66
 The plaintiffs here have alleged that they are injured because, unless § 654(b)(1) is held to be unconstitutional, they will be barred from engaging in homosexual acts. The district court found that this allegation of injury was insufficient to meet the requirements of standing because "the court cannot assume that plaintiffs would be able to find third-party participants." Able, 1995 WL 116322, at * 4. The district court erred, however, in its conclusion that the identification of third-party participants in homosexual acts with plaintiffs was necessary to show an injury in fact.
 
 
 67
 In a case in which the plaintiff has brought an equal protection challenge, " 'the injury in fact' ... is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." Northeastern Florida Chapter of Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993); see Rockefeller, 74 F.3d at 1376. Thus, we have held that standing has been shown where "(1) there exists a reasonable likelihood that the plaintiff is in the disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes members of one group to be treated differently from members of the other group." Comer v. Cisneros, 37 F.3d 775, 793 (2d Cir.1994). Plaintiffs' equal protection challenge to § 654(b)(1) is that homosexuals are being illegally discriminated against because the military punishes sexual acts differently, depending on whether they are engaged in by same sex or opposite sex partners. Under the circumstances of this case, we believe that the standing requirement is met.
 
 
 68
 First, each plaintiff states that he or she is a homosexual, and thus a member of the allegedly disadvantaged group. Second, because § 654(b)(1) states that a member who "has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts" is to be separated unless certain other conditions are met, there is a government-imposed barrier to homosexual conduct. Finally, there is no doubt that the Act treats homosexuals and heterosexuals differently even though they have engaged in similar acts within a broad range (from handholding to intercourse). We therefore reverse the district court's finding that the plaintiffs lack standing to challenge § 654(b)(1).
 
 B.
 
 69
 The district court also dismissed the challenge to § 654(b)(1) on the ground that "the case has developed as a narrow challenge to" the statements presumption and that "it would be improvident to allow ... a profound transformation of the case" by allowing the plaintiffs to challenge the acts prohibition. Able, 1995 WL 116322 at * 5. To be sure, a district court does have "broad discretion in managing a trial." HBE Leasing Corp. v. Frank, 22 F.3d 41, 45 (2d Cir.1994). However, the district court's dismissal of what amounts to half of the plaintiffs' case on this ground was premised on a misperception of what had occurred. While it is true that the recent litigation had focused on the statements presumption, that was only because the military had instituted discharge proceedings against several of the plaintiffs on the basis of their statements; the plaintiffs responded by seeking preliminary injunctive protection from discharge based on the asserted unconstitutionality of the statements presumption. The plaintiffs' motion for a preliminary injunction, necessarily addressed to the statements presumption, in no way relinquished their challenge to the acts prohibition, which they had asserted from the outset. The challenge to the acts prohibition remained central to the plaintiffs' case. Under the circumstances there was no valid basis for the district court's conclusion that the scope of the action had been transformed.
 
 
 70
 Beginning with the filing of the initial complaint a year prior to trial, the plaintiffs have challenged the constitutionality of § 654(b)(1). Nothing in any of the plaintiffs' subsequent filings with either the district court or this court has evidenced an intent to relinquish that claim. Indeed, the complaint and the amended complaint plainly state that they are challenges to the Act, and not just to any particular subsections thereof: the plaintiffs explicitly noted that the "Act requires that a member of the armed forces shall be separated from service ... if the service member ... has engaged or attempted to engage in a 'homosexual act.' " It is difficult for us to imagine what more the plaintiffs could have done to inform the district court and the government that it was challenging subsection (b)(1) as well as subsection (b)(2).
 
 
 71
 The district court believed that our previous decision on the appeal from the preliminary injunctions somehow intended for the trial to cover only § 654(b)(2) because of the abbreviated schedule we gave the parties and the district court. Able, 1995 WL 116322, at * 5. Nothing in our prior opinion supports this speculation, however. It is true that the only issue before us at the time of the previous appeal was the propriety of the district court's injunction of the separation proceedings on the ground that the plaintiffs had demonstrated a sufficiently serious question as to whether the statements presumption of subsection (b)(2) was constitutional. See Able, 847 F.Supp. 1038. In remanding the case, we did not limit the trial to a single claim; rather, we specifically noted that "the district court could decide the merit of plaintiffs' claims within a short period of time." 44 F.3d at 132 (emphasis added).
 
 
 72
 The claim that § 654(b)(1) is unconstitutional lies at the heart of the plaintiffs' challenge to the Act. As we hold in Part IV, infra, the district court's decision that subsection (b)(2) is unconstitutional even if the acts prohibition of subsection (b)(1) is constitutional was erroneous. The subsections rise or fall together: if Congress is permitted to require that service members be discharged if they engage in homosexual acts, then both subsections are constitutional, but if the Constitution prohibits such a requirement, then the statements presumption of subsection (b)(2) must fall as well. Therefore, we believe that the district court's dismissal of the plaintiffs' claim under subsection (b)(1) was not a proper exercise of the district court's discretion.
 
 C.
 
 73
 Both parties invite us to address the merits of the challenge to § 654(b)(1) even though the issue has not been tried in the district court. We decline the invitation. We believe that, in a case in which the district court has erroneously dismissed an essential component of a plaintiff's claim for jurisdictional reasons prior to trial, it is generally unwise for us to decide the merits of that claim on an appeal from the dismissal. This is particularly true in this case where the plaintiffs have raised important constitutional questions as to the appropriate level of scrutiny to be applied to equal protection claims made by homosexuals, see Romer v. Evans, --- U.S. ----, 116 S.Ct. 1620, 134 L.Ed.2d 855, (1996), and how any such test should be applied in the military context. Accordingly, the case is remanded for trial on the plaintiffs' challenge to § 654(b)(1), as well as for reconsideration of the plaintiffs' challenge to § 654(b)(2), as will be seen below.
 
 IV.
 
 74
 We now turn to the core issue of this appeal: the constitutionality of § 654(b)(2). The district court concluded that subsection (b)(2) violated the First Amendment. It reasoned that even if the constitutionality of § 654(b)(1) is assumed, the statements presumption of § 654(b)(2) unconstitutionally "burdens speech based solely on its content" and "works to discharge or subject to discharge proceedings members who possess no more than an 'orientation' regardless of whether they have engaged in or demonstrated a likelihood of engaging in prohibited acts." Able, 880 F.Supp. at 976. In this appeal, the government argues that § 654(b)(2) is not a burden on speech at all, but that the Act burdens homosexual conduct and only uses the speech as evidence that tends to prove homosexual conduct. The government argues further that, even if there is a burden on speech, any such burden easily passes constitutional muster in light of the more speech-restrictive standard that applies in the military context. We agree with the government that the district court's reasoning was erroneous but, for the reasons stated below, we remand this issue to the district court.
 
 A.
 
 75
 Under the Constitution's allocation of responsibility, some functions necessarily implicating constitutional rights are largely committed to the political branches. The Supreme Court has noted that "we must have 'due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution.' " Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981) (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 164, 71 S.Ct. 624, 644, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). This is especially true when we review congressional decisionmaking in the area of military affairs. The formulation and effectuation of military policy is entrusted by the Constitution to Congress and the Executive. Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313-14, 89 L.Ed.2d 478 (1986). For instance, Article I grants Congress the power to "raise and support Armies," to "provide and maintain a Navy," and to "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I., § 8. Article II similarly grants the Executive power over military affairs, stating that the President is the "Commander in Chief of the Army and Navy of the United States." U.S. Const. art. II, § 2.
 
 
 76
 The Supreme Court has recognized that "the military is, by necessity, a specialized society separate from civilian society." Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974); see Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). The military's overriding duty is to prepare for and to fight our nation's battles, Parker, 417 U.S. at 743, 94 S.Ct. at 2555-56, a mission that requires that each individual subordinate personal desires and interests to the common goal. Orloff, 345 U.S. at 92, 73 S.Ct. at 539. In the context of this requirement of individual self-sacrifice to collective needs, the military "must foster instinctive obedience, unity, commitment, and esprit de corps." Goldman, 475 U.S. at 507, 106 S.Ct. at 1313.
 
 
 77
 As judges, we are " 'ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have.' " Id. (quoting Chappell v. Wallace, 462 U.S. 296, 305, 103 S.Ct. 2362, 2368, 76 L.Ed.2d 586 (1983)). Deference to Congress in military matters of course does not mean that Congress operates free of all constitutional restraint when legislating in this area. Rostker, 453 U.S. at 67, 101 S.Ct. at 2653. Nor does it mean that the courts have license to avoid deciding constitutional questions posed by litigants. Id. However, the Supreme Court has repeatedly reminded us that "[j]udicial deference ... 'is at its apogee' when reviewing congressional decisionmaking in this area." Weiss v. United States, 510 U.S. 163, 177, 114 S.Ct. 752, 760-61, 127 L.Ed.2d 1 (1994) (quoting Rostker, 453 U.S. at 70, 101 S.Ct. at 2655); see also Solorio v. United States, 483 U.S. 435, 447, 107 S.Ct. 2924, 2931, 97 L.Ed.2d 364 (1987); Goldman, 475 U.S. at 507-08, 106 S.Ct. at 1313-14; Chappell v. Wallace, 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983). Cf. Department of the Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 825-26, 98 L.Ed.2d 918 (1988) ("[U]nless Congress has specifically provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military ... affairs."). Thus, "[o]ur review of military regulations ... is far more deferential than constitutional review of similar laws or regulations designed for civilian society," Goldman, 475 U.S. at 507, 106 S.Ct. at 1313, and "the tests and limitations to be applied may differ because of the military context," Rostker, 453 U.S. at 67, 101 S.Ct. at 2653.
 
 
 78
 These principles have found concrete expression in the Supreme Court's treatment of free speech challenges in the military context. The Supreme Court first addressed the application of First Amendment freedoms to the armed services in Parker v. Levy, 417 U.S. 733, 758, 94 S.Ct. 2547, 2562-63, 41 L.Ed.2d 439 (1974), in which the Court denied an overbreadth challenge to several punitive provisions of the Uniform Code of Military Justice, on the basis that the overbreadth doctrine has a "different application" in the military context. Soon thereafter, the Court upheld a prohibition on speeches and political demonstrations by civilians on military bases because of the "special constitutional function of the military in our national life." Greer v. Spock, 424 U.S. 828, 837, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976). Later, in Brown v. Glines, 444 U.S. 348, 355, 100 S.Ct. 594, 599-600, 62 L.Ed.2d 540 (1980), the Supreme Court upheld the removal from active duty of an Air Force Reserves officer who, without the permission of his base commander and in violation of Air Force regulations, circulated a petition criticizing Air Force grooming standards. The Supreme Court reasoned that the regulations "restrict[ed] speech no more than [was] reasonably necessary to protect [a] substantial governmental interest." Id.
 
 
 79
 It is plain to us that governmental restrictions on speech that would run afoul of the Constitution if imposed in civilian life can pass constitutional muster in the military context. With this principle in mind, we turn to the merits of the plaintiffs' challenge.
 
 B.
 
 80
 Under subsection (b)(2), a service member will be terminated from the armed forces if the member states that "he or she is a homosexual or bisexual or words to that effect." 10 U.S.C. § 654(b)(2). The member can avoid termination under this subsection only if there is a further finding made by the appropriate military tribunal that the member "has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." Id. The DoD has interpreted the phrase "statement that a member is a homosexual or bisexual, or words to that effect" to include statements such as "I am a homosexual," "I am gay," "I am a lesbian," and "I have a homosexual orientation." DoD Directive 1332.30, encl. 8, at B.4.b. Such a statement need not be expressed in words, however, and it can include behavior that to a reasonable person would convey the message that the member engages in or has a propensity to engage in homosexual acts. Id. Because they have admitted to being homosexuals, the plaintiffs must be discharged unless they can show that they meet the above-stated exception. As we noted earlier, none of the plaintiffs claim that the exception applies.
 
 
 81
 The district court concluded that the statements presumption of § 654(b)(2) impermissibly burdens speech because it is based on the substantive content of its message. See Rosenberger v. Rector & Visitors of the Univ. of Va., --- U.S. ----, ----, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). In effect, according to the district court, subsection (b)(2) subjects service members to discharge based on their self-identification as homosexuals.
 
 
 82
 A restriction that on its face appears to be content-based, yet serves another purpose that by itself is not speech restrictive, may be constitutionally permitted. In City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Court upheld over a First Amendment challenge a zoning ordinance which prohibited an adult movie theater from operating within 1,000 feet of a residential zone, church or park, or within one mile of any school. The Court said that while the ordinance did not appear to fit neatly into either the content-neutral or content-based categories, the controlling factor was the purpose of the city in enacting the legislation: the ordinance was "aimed not at the content of the films shown at [the theaters], but rather at the secondary effects of such theaters on the surrounding community." Id. at 47, 106 S.Ct. at 929. Because the ordinance was "designed to serve a substantial governmental interest and allow[ed] for reasonable alternative avenues of communication," the Court found it to be constitutional. Id. at 50, 106 S.Ct. at 930. See also Madsen v. Women's Health Ctr., Inc., --- U.S. ----, ----, 114 S.Ct. 2516, 2523, 129 L.Ed.2d 593 (1994); Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989); Pro-Choice Network v. Schenck, 67 F.3d 377, 386 (2d Cir.1995) (in banc); cf. Boos v. Barry, 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988) (finding statute to be content-based where the alleged secondary effect was "our international law obligation to shield diplomats from speech that offends their dignity").
 
 
 83
 In this case, the government maintains that any restriction on speech is incidental and wholly subservient to the restriction that the Act places on homosexual conduct. That subsection (b)(2) may restrict speech, based even on content, does not detract from its central purpose, according to the government, which is to prevent or discover homosexual acts. See Thomasson v. Perry, 80 F.3d 915, 932-33 (4th Cir.1996). The plaintiffs, on the other hand, contend that the purpose of the statements presumption, notwithstanding the government's position, is to "keep gay men and lesbians silent about their identity." Brief of Appellees/Cross-Appellants at 21.
 
 
 84
 If we accepted the government's argument that the statements presumption is a content-neutral restriction on speech, it still must pass constitutional muster under the First Amendment. Content-neutral statutes are reviewed under different standards depending upon the facts of each case. See Geoffrey R. Stone, Content-Neutral Restrictions, 54 U. Chi. L.Rev. 46, 47-54 (1987). In Wayte v. United States, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985), the petitioner was prosecuted for violating the Military Selective Service Act after he reported to government officials that he did not intend to register. The petitioner argued that the government's passive enforcement policy, which prosecuted only those individuals who informed the government that they were violating the act, violated the First Amendment because it had an impermissible content-based impact on the speech of non-registrants. Id. at 610-11, 105 S.Ct. at 1532-33. The Court upheld the Justice Department's policy of selecting targets for prosecution under the selective service laws based on the targets' admissions that they had not registered for the draft, reasoning that this regime met the test of United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). A content-neutral speech-restricting statute is justified
 
 
 85
 if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
 
 
 86
 Wayte, 470 U.S. at 611, 105 S.Ct. at 1532-33 (quoting O'Brien, 391 U.S. at 377, 88 S.Ct. at 1679). Assuming that the government is correct that the statements presumption is content-neutral, then the third O'Brien factor would be met and thus the crucial inquiries would be (1) whether the statements presumption furthers a substantial governmental interest, and (2) whether the statements presumption restricts the plaintiffs' speech no more than is essential. See John H. Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv. L.Rev. 1482, 1483 n. 10, 1484 (1975) (noting that the first O'Brien factor is essentially swallowed up by the second and that the third factor determines whether the regulation is content-neutral or content-based).
 
 
 87
 In this case, however, we need not and do not decide whether the statements presumption is content-neutral or content-based for, in either case, we believe that it passes constitutional muster. If, as the government argues, the restriction on speech is an incidental by-product of a content-neutral regulation then it "restrict[s] speech no more than is reasonably necessary to protect [a] substantial governmental interest." Brown v. Glines, 444 U.S. at 355, 100 S.Ct. at 600.
 
 
 88
 If, as the plaintiffs contend, the restriction is a content-based effort to silence gays and lesbians, and even if, in such a circumstance, the government has a higher burden of justification in the military context, we believe that it has met its burden. We are mindful of the general rule that applies in the non-military context that "a statute is presumptively inconsistent with the First Amendment if it imposes a ... burden on speakers because of the content of their speech." Simon & Schuster, Inc. v. New York State Crime Victims Bd., 502 U.S. 105, 115, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991). But this presumption is a rebuttable one. The Court has made clear that a content-based restriction is nevertheless constitutional if it "is a precisely drawn means of serving a compelling state interest." Consolidated Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 540, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980).
 
 
 89
 In the military context, however, as noted above, free speech rights are substantially diminished and the courts' deference to the views of Congress and the military as to the need for speech restrictions based on the requirements of discipline and readiness is high. Arguably, even a content-based restriction in the military context need only pass the test of Brown v. Glines. However, if we were to assume without deciding the question, that a content-based restraint would be unconstitutional in the military context unless it passed a higher threshold--by substantially furthering an important governmental interest, see Thorne v. United States Dep't of Defense, 916 F.Supp. 1358, 1370 (E.D.Va.1996), and is no more restrictive than necessary--we would find the standard to have been met in this case.
 
 C.
 
 90
 The statements presumption of subsection (b)(2) substantially furthers the government's interest (which we assume for purposes of our decision today to be an important interest) in preventing the occurrence of homosexual acts in the military, and, given the rational connection between the statement "I am a homosexual" and the likelihood that the declarant will commit homosexual acts, § 654(b)(2) is no more restrictive than necessary. Thus, if the acts prohibition of subsection (b)(1) is constitutional (the issue to be decided on remand), we believe that the statements presumption of subsection (b)(2) does not violate the First Amendment.
 
 1.
 
 91
 We find that the government has demonstrated that the statements presumption substantially furthers its important interest in preventing homosexual acts in the military.[8] Section 654(b)(2) requires the discharge of a service member even when there is no proof that the person actually engages in homosexual acts if the member has a propensity to engage in those acts. Although the Act does not define "propensity," the Directives specify that it means "more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts." See, e.g., DoD Directive No 1332.14, encl. 3, pt. 1, at H.1.b(2). If the acts prohibition is constitutional, the government has an important interest in discharging those who are likely to engage in such acts. Stated another way, in the context of employment, the government may make a decision based on the likelihood that an individual will engage in prohibited activity, so long as the underlying prohibition is constitutional. See Steffan v. Perry, 41 F.3d 677, 688 (D.C.Cir.1994) (en banc).
 
 
 92
 Section 654(b)(2) creates an evidentiary presumption that a person who identifies himself as a homosexual will engage in or is likely to engage in homosexual acts. This evidentiary use substantially furthers the government's interest because it is plain to us that there is a correlation between those who state that they are homosexual and those who engage in homosexual acts.[9] See, e.g., Watkins v. United States Army, 847 F.2d 1329, 1361 n. 19 (9th Cir.1988) (Reinhardt, J., dissenting) ("To pretend that homosexuality ... is unrelated to sexual conduct borders on the absurd."); cf. United States v. Dinwiddie, 76 F.3d 913, 926 n. 10 (8th Cir.1996) (Arnold, C.J.) (upholding evidentiary use of defendant's advocacy of violence against doctors who perform abortions to determine whether defendant had violated Freedom of Access to Clinic Entrances Act of 1994). There is an even stronger correlation, we think, between those who state that they are homosexuals and those who are at least likely to engage in such acts. Steffan, 41 F.3d at 686 ("[T]he military may reasonably assume that when a member states that he is a homosexual, that member means that he either engages or is likely to engage in homosexual conduct."); Ben-Shalom v. Marsh, 881 F.2d 454, 464 (7th Cir.1989) (The statement by an individual that he is a homosexual "is compelling evidence that [he] has in the past and is likely to again engage in [homosexual] conduct."), cert. denied, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990). But see Richenberg v. Perry, 73 F.3d 172, 174 (8th Cir.1995) (Arnold, C.J., dissenting) (The presumption that a statement of homosexual identity equates with a propensity to act "appears to me to be at best questionable."). Thus, we believe that the prohibition on homosexual acts, if upheld, is also sufficient to sustain the prevention of such acts through discharging those likely to commit those acts.
 
 
 93
 The district court reasoned that § 654(b)(2) "reache[d] speech that [did] not indicate acts" (and therefore would not substantially further the government's interest here) because § 654(b)(2) mandates the discharge of members merely for evidencing an "orientation" regardless of whether they have engaged in or demonstrated a likelihood of engaging in prohibited acts. Able, 880 F.Supp. at 976.[10] The district court held that such a prohibition on non-act related speech was unconstitutional because homosexual orientation alone did not offend a governmental interest; indeed, according to the district court, it was now the policy of the military to allow persons of homosexual orientation to join the armed forces.
 
 
 94
 The district court acknowledged that the Directives created a difference between a homosexual orientation and a propensity or likelihood to engage in homosexual acts. Nonetheless, the district court concluded that no such distinction exists and therefore held that the Act impermissibly allowed for discharge from military service based on status.
 
 
 95
 Because plaintiffs have mounted a facial challenge to the Act, they must show that, no matter how the Act is read, it punishes status and not conduct. See United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).[11] In addition, because this is a challenge to the constitutionality of the Act, we are required to construe it "so as to avoid constitutional difficulties whenever possible." Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 60 (2d Cir.1992); see United States v. Monsanto, 924 F.2d 1186, 1200 (2d Cir.), cert. denied, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). The plaintiffs' burden here is amplified, because the DoD's Directives define propensity to engage in homosexual conduct to mean a likelihood, and we are required to give deference to that definition. Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82.
 
 
 96
 Contrary to the district court, we do not believe that, in the context of a facial challenge, we may conclude that the Act equates status with propensity. To be sure, in most cases a member who admits to a homosexual orientation will eventually be separated from the armed forces. But that is because the evidentiary value of the admission is strongly linked to what it is used to prove: a likelihood of engaging in homosexual acts. The plaintiffs cannot prove and the district court cannot credibly maintain that there are no instances in which a person will be retained, despite admitting to a homosexual status, because there is no likelihood that he will engage in such acts. The Directives promulgated by the DoD in accordance with the Act specifically contemplate that such an event may occur. See DoD Directive No. 1332.14, encl. 3, pt. 1, at H.1.b(2). Furthermore, we do not minimize the fact that, as the government represented at oral argument without contradiction, in seven cases (out of forty-three attempts), service members have been able to rebut the presumption created by their admission and have been retained. While the district court considered these cases to be mere "aberrations," we believe that they demonstrate that the admission of homosexual status does not inevitably equate with a finding of propensity to engage in homosexual acts.
 
 
 97
 Amicus Family Research Council ("FRC") agrees with our interpretation of the Directives, but contends that "the provision in the DoD Directives that homosexual 'orientation ... is not a bar to service or continued service,' is nowhere to be found in [Congress's] handiwork." Brief of Amicus Curiae FRC at 11 (quoting Able, 880 F.Supp. at 973-74). The FRC argues that the government's interpretation of the statute as limited to forbidding homosexual conduct is wrong and that the statute bars all those who are known to have a homosexual orientation. See also Thomasson, 80 F.3d at 937 (Luttig, J., concurring) (Congress intended to bar all known homosexuals, not just those likely to engage in homosexual acts). We disagree.
 
 
 98
 Contrary to the FRC's argument, the Act does not bar those who have a homosexual orientation but are not likely to engage in homosexual acts. Section 654(b) requires the discharge of a service member in three circumstances: first, when the member has engaged in homosexual acts (unless certain other findings are made); second, when the member has stated that he is a homosexual, unless there is a further finding that the member does not engage in, attempt to engage in, or have a "propensity" to engage in homosexual acts; and third, when the member has married or attempted to marry a person of the same biological sex. 10 U.S.C. § 654(b)(1)-(3). All three grounds for discharge are anchored in the need for a homosexual act, or at least the likelihood of such an act, before the member can be discharged. The only evidence to the contrary is the use of the word "propensity" in § 654(b)(2), which Judge Luttig, concurring in Thomasson, construed to mean an "inclination." See Thomasson, 80 F.3d at 939 (Luttig, J., concurring). The difficulty with Judge Luttig's conclusion that the use of "propensity" indicates Congress' intention to discharge all service members with a known homosexual orientation, however, is that Congress failed to define what it meant by "propensity." While there is some evidence to support Judge Luttig's view that, when it used the term "propensity," Congress meant "orientation" or "inclination," there is also substantial evidence to support the government's position that it means likelihood to engage in acts.
 
 
 99
 First, the other two restrictions of § 654(b), the acts prohibition of subsection (b)(1) and the prohibition on gay marriage of subsection (b)(3), are based on actions taken by service members and not on their sexual orientations. Second, the detailed findings in support of the legislation make no reference to homosexual orientation; rather they refer to the "prohibition against homosexual conduct," 10 U.S.C. § 654(a)(13), and the need to exclude those "who demonstrate a propensity or intent to engage in homosexual acts," 10 U.S.C. § 654(a)(15). Moreover, Congress and the executive branch were fully aware at the time of the drafting of the Act that the Ninth Circuit had held that the discharge of service members based on their sexual orientation alone might be unconstitutional, see Pruitt v. Cheney, 963 F.2d 1160, 1164-66 (9th Cir.), cert. denied, 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992), and therefore both branches had good reason to settle on a standard that would avoid a potential constitutional infirmity. Indeed, the regulation which served as the basis for § 654(b)(2) had stated that the statements presumption could only be overcome if the service member demonstrated that he was not a homosexual or bisexual. 32 C.F.R. pt. 41, app. A, at H.1.c(2) (1993). The Act, however, provides that a service member can overcome the presumption if he "demonstrate[s] that he ... is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." 10 U.S.C. § 654(b)(2). This change suggests to us that Congress intended to move away from the emphasis on homosexual orientation under the former policy and to substitute an act-based policy in its place.
 
 
 100
 If Congress's intent to exclude persons solely on the basis of their homosexual orientation was clear, we would be required to construe the Act in that manner. Chevron, 467 U.S. at 842, 104 S.Ct. at 2781. Had Congress used "orientation" or "inclination" instead of "propensity," we would be faced with a statute that required the discharge of service members based on their known sexual orientation. But when, as here, the statute is ambiguous on this issue, we must ask whether the military's construction of § 654(b)(2) is permissible. Id. at 843, 104 S.Ct. at 2782. Because we find that the government "defines [propensity] in a way that is reasonable in light of the legislature's revealed design," NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., --- U.S. ----, ---- - ----, 115 S.Ct. 810, 813-14, 130 L.Ed.2d 740 (1995), we accord that definition controlling weight, and decline the invitation by amicus FRC to read the Act to require the discharge of service members based on their sexual orientation alone.
 
 
 101
 In sum, because the statements presumption stands on the same footing in terms of governmental interest as the acts prohibition (which for present purposes we assume to be constitutional, although that issue remains to be resolved), the substantial interest in restricting speech standard has been met.
 
 2.
 
 102
 We also find that the statements presumption restricts speech no more than is reasonably necessary. The military has made the reasonable judgment that a declaration of homosexuality is a likely (but rebuttable) indicator of propensity to engage in prohibited sexual conduct. This provision plays a significant role in the military's effort to eliminate homosexual conduct from the military--an objective that it regards as important. To deprive the military of the benefit of the statements presumption would significantly impair its accomplishment of that objective.
 
 
 103
 As we noted above, the new policy creates a balance between a service member's privacy interest and the military interest in prohibiting homosexual acts by restricting how and when military authorities may initiate an investigation into such acts while at the same time creating a rebuttable presumption in favor of the government when a member identifies himself as a homosexual. Thus, as a general matter, a service member will be investigated about private sexual activities only if he does something (either by announcing his sexuality or by engaging in conduct which is thereafter reported) that brings the individual to the attention of military authorities. The plaintiffs ask us to upset this equilibrium by holding the statements presumption unconstitutional. However, because the new policy strikes a reasonable balance between the competing interests and because the policy is important to the military's accomplishment of its objectives, we find that it restrains speech no more than is reasonably necessary.
 
 D.
 
 104
 The foregoing analysis is premised upon the same assumption that the district court made in its opinion: that the ban on homosexual acts found in § 654(b)(1) is valid under the Constitution. The government does not contend (nor could it) that in the event that § 654(b)(1) is held to be unconstitutional, § 654(b)(2) may still be upheld. Plainly, a limitation on speech in support of an unconstitutional objective cannot be sustained. Accordingly, although we reject the district court's reasoning in holding § 654(b)(2) unconstitutional, we remand the § 654(b)(2) claim to the district court for reconsideration in light of its determination in the first instance as to § 654(b)(1).
 
 V.
 
 105
 In conclusion, we affirm the district court's orders finding that the plaintiffs need not exhaust their administrative remedies. We reverse the district court's order dismissing the § 654(b)(1) claim. Finally, we remand the plaintiffs' claim that § 654(b)(1) is unconstitutional for consideration by the district court in the first instance and we remand the § 654(b)(2) claim for reconsideration in light thereof.
 
 
 106
 We vacate the judgment and we remand this case to the district court for further proceedings consistent with this opinion. The district court, of course, may in the exercise of its discretion allow the parties to pursue whatever pretrial procedures they think appropriate and to supplement the record. In the event of any further appeal in this matter, the clerk is directed to refer the appeal to this panel if practicable.
 
 
 
 [1]
 "Jane Able" is a pseudonym for a lesbian who is a Lieutenant Colonel currently serving in the United States Army Reserves
 
 
 [2]
 "Robert Heigle" has, at various times in this litigation, also been referred to as "Robert Heigl." For purposes of this opinion, we will refer to him by the name given in the caption
 
 
 [3]
 The plaintiffs' notice of appeal states that they also appeal from the district court's decision that they lacked standing to challenge the entire act as violating their right to engage in expressive association. To the extent that such a claim differs from their challenges to § 654(b)(1) & (2), raised in their briefs on appeal, we deem it to have been waived
 
 
 [4]
 The Coast Guard implemented a similar policy. See Letter from Federico Pena, Secretary of Transportation, to Commandant, United States Coast Guard (Mar. 15, 1994)
 
 
 [5]
 On appeal, the plaintiffs expressly abandoned their § 654(b)(3) claim
 
 
 [6]
 Of course, in the present case no "adverse administrative determination" has yet occurred because the district court has enjoined all separation proceedings against the plaintiffs. But even where an adverse determination has not yet been made, a party may still be required to exhaust its administrative remedies. See Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463-64, 82 L.Ed. 638 (1938) (doctrine of exhaustion of remedies applied where NLRB had filed complaint against company but had not yet held hearing on complaint)
 
 
 [7]
 The Supreme Court, in Darby v. Cisneros, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), held that the Administrative Procedure Act places further restrictions on the applicability of the exhaustion of administrative remedies doctrine, but none of those restrictions applies here. See Howell, 72 F.3d at 291
 
 
 [8]
 Of course, we assume but do not decide that the interest which supports the acts prohibition is sufficient to withstand constitutional scrutiny. Our holding here is limited solely to whether the statements presumption furthers the governmental interest in preventing homosexual acts
 
 
 [9]
 This evidentiary use of a member's statement is not an innovation in the Act, but was present in the former policy as well. 47 Fed.Reg. 10,162, at 10,179 (1982)
 
 
 [10]
 The district court assumed that the separation of a service member only because he has a homosexual orientation would violate the Constitution because the separation would be based on status alone. See Able, 880 F.Supp. at 975 ("Defendants recognized that a policy mandating discharge of homosexuals merely because they have a homosexual orientation or status could not withstand judicial scrutiny."). For the purposes of our analysis, we assume that this is true; although the constitutionality of a discharge based on mere orientation is an unsettled question, see Meinhold v. United States Dep't of Defense, 34 F.3d 1469, 1476-77 (9th Cir.1994) ("Construing the [former policy] to apply to the 'classification of being homosexual' clearly implicates equal protection."); see also Romer, --- U.S. ----, 116 S.Ct. 1620 (state constitutional amendment barring all government action designed to protect those with homosexual orientation violates the Equal Protection Clause), it is not one that we need resolve today
 
 
 [11]
 There is some dispute in the courts over whether Salerno requires that the plaintiff in a facial challenge show that there is no set of circumstances under which a statute is valid or whether it is sufficient that the plaintiff show that the statute would be invalid in a large percentage of cases. Compare Janklow v. Planned Parenthood, Sioux Falls Clinic, --- U.S. ----, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Stevens, J., concurring in denial of petition for certiorari), with id. at ----, 116 S.Ct. at 1584 (Scalia, J., dissenting from denial of petition for certiorari). We have held, however, that there must exist " 'no set of circumstances ... under which the [statute] would be valid,' " Giusto v. INS, 9 F.3d 8, 10 (2d Cir.1993) (quoting Salerno, 481 U.S. at 745, 107 S.Ct. at 2100), and neither the plaintiffs nor the government has asked us to revisit that rule here